## CHESAPEAKE CONSTRUCTION CORPORATION, ET AL. *v.* RODMAN, ET AL.

[No. 132, September Term, 1969.]

*Decided February 3, 1970.*

532

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SMITH and DIGGES, JJ.

*Donald B. W. Messenger*, with whom were *Joseph Gelb* and *Jaffee, Shaw & Rosenberg* on the brief, for appellants Morris Rodman, Executor of Samuel Rodman, deceased, and Bella Rodman.

No brief filed for appellant Chesapeake Construction Corporation.

*C. L. Fossett, Jr.*, with whom were *Beatty & McNamee* on the brief, for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

Chesapeake Construction Corporation (Chesapeake) is a Delaware corporation; its avowed purpose is the development of real property. In June 1967 Samuel J. Rodman (Samuel) owned 75 of the 100 shares of its stock. He was also its president and one of its directors. Karl Rodman (Karl), Samuel's brother, owned the remaining 25 shares. He was its secretary and treasurer and a director. The record is silent as to the existence of any other directors at that time. Early in June 1967 Samuel and Bella, his wife, conveyed a 123 acre Prince George's County tract, known as "Tantallon Hills Subdivision,"

to Chesapeake for a consideration of $1,100,000 evidenced by a purchase money mortgage for $1,000,000 and an unsecured note for $100,000. The board of directors did not authorize the purchase either by resolution or otherwise. Karl did not learn of the transaction until after Samuel's death on 10 December 1967. Samuel executed the mortgage and Bella, neither an officer nor a director at the time, attested the corporate seal. Corporate funds in the amount of $6,838 were expended for recording, stamps and transfer taxes.

On 29 March 1968 Bella, as surviving tenant by the entireties, sold the $1,000,000 mortgage to Tantallon Country Club, Inc. (Tantallon) for $675,000. Chesapeake then conveyed the 123 acres to Tantallon in order to obtain the release of the mortgage. In May Bella and Morris Rodman, Samuel's executor (Morris), gave Tantallon a quitclaim deed. An appraisal obtained by Karl, and not challenged by any of the parties, indicates the fair market value of the property in June 1967 to have been $614,147.

On 8 April 1968 Karl made formal demand upon Chesapeake, Bella and Morris to declare the transaction void *ab initio* and to recover for Chesapeake all expenses sustained in connection therewith. Both Bella and Morris had become directors of Chesapeake but one cannot tell from the record how or when this was accomplished. A meeting of the directors was held in New York on 19 April. Karl offered a resolution calling upon the officers to "take all necessary action to void the sale" and to recover "all costs, losses, and expenses" incurred as a result thereof. Karl voted in favor of the resolution, Bella abstained, Morris voted against it and announced its defeat.

Karl filed his bill of complaint against Chesapeake, Bella, Morris and Tantallon on 13 May 1968. Bella, Morris and Tantallon answered but no answer appears to have been filed on behalf of Chesapeake. The case came on for argument on Karl's motion for summary judgment before Powers, J., on 17 February 1969. All parties agreed that Tantallon was an innocent purchaser and it

was stipulated that, whatever the outcome, the decree should contain a provision declaring Tantallon to be vested with title to the property. Counsel for Bella and Morris conceded his inability to make a proffer of any facts tending to establish the fairness of the sale to Chesapeake. He insists, however, that Bella was entitled to the payment of the $100,000 note. Judge Powers, after hearing argument, declared the deed, the mortgage and the unsecured note to be null and void *ab initio*. Also he ordered Bella and Morris to pay to Chesapeake the sum of $6,838; Tantallon was declared to be vested with title to the property.

Judge Powers, in his concise memorandum, relied upon *Cumberland Coal and Iron Co. v. Parish*, 42 Md. 598 (1875). We agree that it is generally applicable to the facts in the case before us. Judge Alvey (later Chief Judge) said, for the Court:

> "The affairs of corporations are generally intrusted to the exclusive management and control of the board of directors; and there is an inherent obligation, implied in the acceptance of such trust, not only that they will use their best efforts to promote the interest of the shareholders, but that they will in no manner use their positions to advance their own individual interest as distinguished from that of the corporation, or acquire interests that may conflict with the fair and proper discharge of their duty. The corporation is entitled to the supervision of all the directors, in respect to all the transactions in which it may be concerned; and if one of the directors is allowed to place himself in the position of having his conduct and accounts made the subject of supervision and scrutiny, he, of course, cannot act, in regard to those matters, both for himself and the corporation; and the consequence is, that the corporation is deprived of the benefit of his judgment and supervision

in regard to matters in which such judgment and supervision might be most essential to its interest and protection. Not only this, the remaining directors are placed in the embarrassing and invidious position of having to pass upon, scrutinize and check the transactions and accounts of one of their own body, with whom they are associated on terms of equality in the general management of all the affairs of the corporation. The design of the rule, therefore, is to secure a faithful discharge of duty, and, at the same time, to close the door, as far as possible, against all temptation to do wrong, by subjecting the transactions between parties standing in such confidential relations, to the most exact and rigid scrutiny, whenever such transactions are brought in question before the Courts.

"The transaction may not be *ipso facto* void, but it is not necessary to establish that there has been actual fraud or imposition practiced by the party holding the confidential or fiduciary relation;—the *onus* of proof being upon him to establish the perfect fairness, adequacy, and equity of the transaction; and that too by proof entirely independent of the instrument under which he may claim." *Id.* at 605-606.

Appellants, injecting into their argument a liberal dose of casuistry, insist that the case at bar is distinguishable from *Cumberland, supra.* They say that Samuel cannot be saddled with the burden of establishing the "fairness, adequacy and equity of the transaction" because he is dead and, therefore, "cannot come forward with evidence" and that, anyway, Chesapeake "is a closely held corporation." Actual fraud, they continue, must be shown; the mere showing that Samuel's transfer of land to his "closely held corporation for an inflated price is not fraud per se." And, by way of sweeping the whole business under the rug, they declare that the transaction

was ratified by the directors at the meeting held in New York on 19 April 1968.

While at one time our predecessors seemed to favor setting aside such transactions upon the application of an interested party regardless of the question of fairness to the corporation, *see Cumberland Coal & Iron Co. v. Sherman,* 20 Md. 117 (1863) ; *Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co.,* 16 Md. 456 (1860), it is now well settled that a transaction such as the one before us will always be closely scrutinized and, if shown to be unfair or entered into in bad faith by the corporate officer, nullified. And, as observed by Judge Powers, the burden of proving that the contract is fair, adequate and equitable is upon the officer or director. *See Cumberland Coal & Iron Co. v. Parish, supra.* To the same effect *see Cummings v. United Artists Theatre Circuit, Inc.,* 237 Md. 1, 18-19 (1964) ; *Indurated Concrete Corp. v. Abbott,* 195 Md. 496, 503-04 (1950) ; *Ross Transport, Inc. v. Crothers,* 185 Md. 573, 583-84 (1946) ; and H. Brune, Jr., *Maryland Corporation Law and Practice,* § 225 (Rev. ed. 1953).

We are far from persuaded that the instant case warrants the application of rules different from those above noted. That Chesapeake is a "closed" corporation is without significance here and it should surprise no one that appellants have been unable to cite any authorities in support of such a notion. Nor do we think it matters that Samuel was not available to attest personally to the fairness of the transaction. That the best interests of the corporation were not being advanced is so plain that any analysis of the facts is unnecessary. Indeed many courts have held that where an officer or director contracts with the corporation and at the same time acts for the corporation to the extent that his action or vote is essential to the consummation of the transaction, it is voidable at the option of the corporation despite its adequacy or fairness. The cases are collected and the rule is discussed in 24 A.L.R.2d 71, 91-95 (1952).

The argument that the transaction was ratified by the

board of directors at the New York meeting comes close to being a fatuity. As a general rule "[t]he violation of their duty by corporate directors cannot be ratified by the action of those who were guilty of participation in the wrongful acts, even though they constitute a majority of the directors or of the stockholders." 19 C.J.S., *Corporations* § 763 (b) at 112. *See also Cumberland Coal & Iron Co. v. Sherman, supra* at 148.

We see no reason for disturbing the decree passed by Judge Powers.

*Decree affirmed.*
*Costs to be paid by appellants.*