498 A.2d 642

**Mary P. TONER**

v.

**The BALTIMORE ENVELOPE COMPANY, et al.**

**Misc. No. 9, Sept. Term, 1984.**

Court of Appeals of Maryland.

Oct. 10, 1985.

Craig B. Merkle and Sidney G. Leech, Baltimore (Cleaveland D. Miller and Semmes, Bowen & Semmes, Baltimore, on brief), for appellant.

Rob Ross Hendrickson, Baltimore (Boyd, Benson & Hendrickson, Baltimore, on brief), for appellees.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

RODOWSKY, Judge.

Appellant, Mary P. Toner (Toner), is a nonvoting shareholder with a minority ownership in a closely held corporation. She complains of the corporation's having bought the nonvoting stock of some of the other shareholders without having bought her nonvoting stock. Appellant asserts that, solely because the corporation made those purchases, it became obliged to purchase all of her nonvoting stock at the same price. We shall decline, for reasons hereinafter set forth, to adopt that per se rule as Maryland law.

This case comes to us from the United States District Court for the District of Maryland under the Uniform Certification of Questions of Law Act, Md.Code (1974, 1984

Repl.Vol.), §§ 12–601 to –609 of the Courts and Judicial Proceedings Article (Courts Article). The facts are set forth in the certification order. In light of the narrow legal argument made by Toner, the federal court's statement of facts is limited to an outline of the stock purchase transaction.

The Baltimore Envelope Company (Envelope Co.), a Maryland corporation, was founded in 1930 by two brothers, Charles H. Peters, Sr. (Charles Sr.) and Arthur H. Peters (Arthur). We are next told of the situation prevailing in 1979. Charles H. Peters, Jr. (Charles Jr.), son of Charles Sr., is president of the company. Appellant Toner is a daughter of Charles Sr. Arthur has died and is survived by his widow, Elma. Arthur and Elma had three daughters, Janet P. Heaphy, Betty P. Van Horn, and Shirley P. Hall. We shall call Elma and her three daughters the Elma Branch. The capital stock of Envelope Co. is divided into two classes of common stock, Class A, which has voting rights, and Class B, which is nonvoting. There are 8,000 shares of Class A outstanding, 50% of which Charles Jr. owns and 50% of which Elma owns. Each of the above-named surviving members of the Peters family owns some of the nonvoting stock. The Board of Directors in 1979 consists of four persons, Charles Jr., Clarke E. Murphy, Jr. (Murphy), and two representatives of the Elma Branch, Griffith Hall (Hall) and Lowell Bowen (Bowen).

In discussions during 1979 among the stockholders concerning the future of the company, the Elma Branch expressed a strong desire either to sell the company or to sell their stockholdings as a unit. Also in 1979 Tri-State Envelope Corp., a business located in Pennsylvania, offered to purchase the fixed assets of Envelope Co. for $575,000. At that time both Charles Jr. and Toner expressed an interest in purchasing the shares held within the Elma Branch, but neither was financially able to do so.

At a meeting on August 9, 1979, the directors of Envelope Co. considered a motion presented by Hall that the

company accept the Tri-State offer and then liquidate. Hall and Bowen voted in favor of the motion while Charles Jr. and Murphy voted against it. Murphy then proposed that Envelope Co. purchase 15,432 shares of the nonvoting stock owned by the Elma Branch at an aggregate price of $300,-000. Charles Jr. stated that this offer was made in conjunction with an offer "made by an individual" to purchase the 4,000 shares of voting stock and the remaining 1,141 shares of nonvoting stock owned by Elma. Under the proposal all of the stock to be acquired would be purchased at $19.44 per share, whether it was voting or nonvoting. On the advice of Bowen, Hall left the directors' meeting. In his absence the resolution for corporate purchase of shares carried, based on the votes of Charles Jr. and Murphy, with Bowen abstaining.

Thereafter Charles Jr. and Murphy caused Envelope Co. on September 17, 1979, to borrow from a bank $325,000 secured by corporate assets. Using approximately $300,000 of these borrowed funds Envelope Co. acquired 15,432 shares of its nonvoting stock from the Elma Branch. On September 19, 1979, Murphy acquired for approximately $100,000 the 4,000 shares of voting stock and remaining 1,141 shares of nonvoting stock owned by Elma. He transferred one of the voting shares to Charles Jr. "without consideration." Based on the stockholdings before and after the transaction, as the statement of facts presents them, we set forth the following composite:

|                                                          | Prior to Purchases | After Purchases |
|----------------------------------------------------------|--------------------|-----------------|
| **Issued and outstanding Class A Voting Stock (in shares)** |                    |                 |
| Charles Jr.                                              | 4,000              | 4,001           |
| Elma                                                     | 4,000              |                 |
| Murphy                                                   |                    | 3,999           |
|                                                          | 8,000              | 8,000           |
| **Issued and outstanding Class B Nonvoting Stock (in shares)** |               |                 |
| Charles Jr.                                              | 8,663              | 8,663           |
| Toner                                                    | 6,654              | 6,654           |
| Elma                                                     | 10,903             |                 |
| Janet P. Heaphy                                          | 1,890              |                 |
| Betty P. Van Horn                                        | 1,890              |                 |
| Shirley P. Hall                                          | 1,890              |                 |
| Murphy                                                   |                    | 1,141           |
|                                                          | 31,890             | 16,458          |

Toner brought suit in the United States District Court against Envelope Co., Charles Jr., and Murphy. That litigation includes a derivative claim with which we are not concerned. The remedy which Toner seeks is an order directing Envelope Co. to purchase her nonvoting stock under the same terms and conditions offered by the company to members of the Elma Branch for their nonvoting stock. To reach this result Toner makes two arguments.

One involves what she calls the "rule of non-discrimination." In this argument Toner dissects the transaction into separate steps. Step one concerns the decision to undertake the transaction and, for purposes of this argument, Toner concedes that the propriety of that decision is properly analyzed under the business judgment rule. The second step concerns the manner in which the transaction is carried out. At that step, Toner contends, "the corporation has *no discretion* to prefer one group of shareholders over another and accordingly its conduct in this stage is controlled by the rule of non-discrimination, rather than the business judgment rule." (Emphasis in original.)

Toner's second, and principal, argument asks us to apply, as a matter of law, the following proposition which is the first certified question stated in declarative form:

Where the directors and majority of voting shareholders of a closely held corporation caused the corporation to repurchase the nonvoting shares from some, but not all, of the corporation's nonvoting shareholders, [the corporation must] accord a minority holder of nonvoting stock who [is] excluded from the repurchase arrangement, an equal opportunity to sell her shares to the corporation under the same terms and conditions offered to other holders of nonvoting stock[.]

### (1)

Toner's first argument presses the concept of nondiscrimination between holders of shares of the same class to a literal extreme. We have said that a corporation "in making a dividend, has no power to discriminate between its stockholders [of the same class]." *State v. Baltimore & O.R.R. Co.*, 6 Gill 363, 373 (1847).[1] And see 11 *Fletcher Cyclopedia of the Law of Private Corporations* § 5352 (M. Wolf rev. ed. 1971 & Supp.1984) (Fletcher). Nondiscrimination between shareholders was also the basis for denying a motion to dismiss one of the claims for relief pleaded in *Twenty Seven Trust v. Realty Growth Investors*, 533 F.Supp. 1028 (D.Md.1982). That case arose out of a tender offer directed to the shareholders of a Maryland real estate investment trust. Following through on their earlier announcement, the trustees made a distribution in partial liquidation to all pre-tender shareholders. Those owning

---

1. The B & O had declared a dividend of $3 per share payable in cash to shareholders that owned less than 50 shares and of $1 in cash and $2 in bonds to all other shareholders. The State of Maryland, as the owner of 5,000 shares, rejected the dividend and brought an action of *indebitatus assumpsit* for $15,000 in cash. The limited holding of the case is that the form of action chosen by the plaintiff would not lie "'because there was not money in hand to divide that sum, and the dividend declared did not profess to be a dividend to that extent in money.'" 6 Gill at 374–75.

1,000 shares or less received $17.19 in cash while those, including the plaintiff, owning more than 1,000 shares received $15.29 in distribution certificates and secured notes. The district court concluded that the distributions were sufficiently analogous to dividends to warrant the application of a strict nondiscrimination rule. Toner says such a rule likewise applied when Envelope Co. purchased the Elma Branch's nonvoting stock.

■ Envelope Co. is an ordinary business corporation governed by Md.Code (1975, 1985 Repl.Vol.), Titles 1, 2, and 3 of the Corporations and Associations Article.[2] Subject to certain limitations not relevant here, a Maryland corporation has the general power to "acquire any of its own stock...." § 2-103(10). Power to acquire "any" of its stock does not restrain a corporation from selectively acquiring some of the stock of a given class. A strict nondiscrimination rule would oblige Envelope Co. to offer to buy all of the nonvoting stock of Charles Jr., in addition to Toner's, because of the corporate purchase from the Elma Branch. The mere fact that a Maryland corporation seeks to purchase some of its own stock does not automatically create a duty to extend the offer to all other holders of shares of the same class.

Sections 2-310 and 2-311 demonstrate this conclusion. In relevant part they provide:

§ 2-310. Power to acquire own stock.

(a) *Redemption or exchange.*—Subject to the provisions of its charter and § 2-311 of this subtitle, a corporation may:

(1) Redeem shares of its own stock that the charter provides are redeemable; or

(2) Exchange convertible shares.

(b) *Additional acquisitions.*—Subject to the provisions of its charter and § 2-311 of this subtitle, if authorized by

---

**2.** Unless otherwise noted all statutory references arc to the current Corporations and Associations Article.

its board of directors, a corporation may acquire shares of its own stock in all other cases, including:

(1) Purchase of stock that the charter provides is redeemable; or

(2) Gift or legacy.

(c) *Specific purposes for acquisition.*—Subject to the provisions of its charter and § 2–311 of this subtitle, if authorized by its board of directors, a corporation may acquire shares of its own stock to:

(1) Eliminate fractional shares;

(2) Collect or compromise a corporate debt or claim, if done in good faith; or

(3) Satisfy or compromise a claim of an objecting stockholder under Title 3, Subtitle 2 of this article.

§ 2–311.  Limitations on acquisition of own stock.

(a) *Limit on consideration.*—(1) A corporation may not purchase or redeem shares of its stock that the charter provides are redeemable at the time of the redemption or purchase for a consideration greater than either:

(i) The redemption price at the time of the acquisition; or

(ii) Unless a sinking fund or similar provision of the charter requires otherwise, the net asset value per share.

(2) In determining net asset value per share under this subsection, assets are attributable to the classes of stock in the order of their respective seniority.  However, in the case of redeemable stock the amount may not exceed the current redemption price.

. . . .

(c) *Insolvency.*—A corporation may not purchase or redeem any of its stock if the corporation is insolvent or the transaction would cause the corporation to become insolvent.

(d) *How acquisition charged.*—Except for an acquisition under § 2–310(c) of this subtitle or subsection (a) or

(b) of this section, a corporation may purchase or redeem its stock only out of surplus.

By referring to a corporation's acquiring shares of its own stock to eliminate fractional shares, to collect or compromise a debt or claim, or to satisfy or compromise a claim of an objecting stockholder, § 2–310(c) specifically contemplates that acquisitions may be made on an individualized basis. For an acquisition to be valid does not require a like offer to all holders of the same class of stock.

■ Toner suggests that § 2–310(c) supports her argument because "[t]hat provision specifically limits the purposes for which a corporation may acquire its own stock...." This is a misinterpretation of § 2–310(c). The three purposes enumerated in subsection (c) are set forth separately in § 2–310 because they are treated separately in § 2–311. Those three situations are excepted by § 2–311(d) from the general requirement that a corporation may purchase its stock only out of surplus. *See* H. Brune, *Maryland Corporation Law and Practice* § 49, at 52–53 (rev. ed. 1953) (Brune), commenting on the predecessor statute, Md.Code (1951), Art. 23, § 28, a part of the general revision of the corporation laws enacted by Ch. 135 of the Acts of 1951. Sections 2–310(c) and 2–311(d) are derived from the 1951 enactment.

The reference in § 2–310(b) to acquisition of its shares by a corporation "in all other cases" also undermines Toner's position. Immediately prior to the recodification of the corporation statutes into the Corporations and Associations Article, the provisions dealing with when a corporation could acquire its own stock were codified as Md.Code (1957, 1973 Repl.Vol.), Art. 23, § 32(a). It provided in relevant part:

> (a) *How and when acquisition, retention or disposition effected.*—Any corporation of this State may, from time to time, subject to the limitations contained in this section:
>
> ....

(3) Acquire shares of its own stock upon authorization of the board of directors (i) to eliminate fractional shares, (ii) to collect or compromise in good faith a debt due to or a claim of or against the corporation, or (iii) to satisfy or compromise claims of objecting stockholders entitled to payment for their stock pursuant to this article;

(4) Acquire shares of its own stock *in all other cases*, including gift or bequest, upon authorization by the board of directors and, if required by the charter, upon further authorization by stockholders of any class or classes.  [Emphasis added in (4).]

The three situations specified in former § 32(a)(3) were then excepted by former § 32(b)(3) from the requirement that a corporation acquire its own stock only out of surplus. When part of former § 32 was recodified into § 2–310 of the Corporations and Associations Article by Ch. 311, § 2 of the Acts of 1975, the reference to "all other cases" was omitted.  The omission was cured at the next session of the General Assembly when Ch. 567 of the Acts of 1976 inserted "in all other cases" in subsection (b) of § 2–310.  Consequently, the three situations set forth in § 2–310(c) are exceptions to a general rule that acquisitions of stock shall be made out of surplus.  Section 2–310(c) does not list the exceptions to an otherwise absolute rule of nondiscrimination.

### (2)

Toner next argues for a judicial overlay on the general corporation statutes, an overlay which she would apply only to closely held corporations.  Because the market for sale of minority shares in a closely held corporation is limited or nonexistent, Toner asks us to mandate that an equal opportunity to sell to the corporation be extended to all holders of a class of shares when the corporation purchases any of its shares of that class.  Inasmuch as it is the particular relief which this argument emphasizes, the cases on which Toner principally relies base their holdings variously on the duty

of the majority to the minority and on the duty of directors to the corporation and its shareholders as such.

There are Maryland cases which have recognized the fiduciary obligation of majority shareholders, in certain matters, to minority shareholders. *See Baker v. Standard Lime & Stone Co.,* 203 Md. 270, 100 A.2d 822 (1953); *Cooperative Milk Service, Inc. v. Hepner,* 198 Md. 104, 81 A.2d 219 (1951); *Levine v. Imperial Pkg. Corp.,* No. 1967/A203 (Cir.Ct.Balt.City Jan. 25, 1968); *United Funds, Inc. v. Carter Products, Inc.,* Daily Record, Sept. 23, 1963, at 2, col. 1 (Cir.Ct.Balt.City No. 102A/450). And *see* Brune, *supra,* § 252 (Supp.1974). The duty has been accepted, in a variety of contexts, by many other jurisdictions. *See, e.g., Southern Pacific Co. v. Bogert,* 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 (1919); *McDaniel v. Painter,* 418 F.2d 545 (10th Cir.1969); *Perlman v. Feldmann,* 219 F.2d 173 (2d Cir.), *cert. denied,* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); *Burt v. Burt Boiler Works, Inc.,* 360 So.2d 327 (Ala.1978); *Alaska Plastics, Inc. v. Coppock,* 621 P.2d 270 (Alaska 1980); *Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 460 P.2d 464, 81 Cal.Rptr. 592 (1969); *Singer v. Magnavox Co.,* 380 A.2d 969 (Del.1977); *Cressy v. Shannon Continental Corp.,* 177 Ind.App. 224, 378 N.E.2d 941 (1978). And *see* 12B Fletcher, *supra,* § 5811 (C. Swearingen rev. ed. 1984) and cases cited therein; Johnson, *Strict Fiduciary Duty in Close Corporations: A Concept in Search of Adoption,* 18 Cal.W.L.Rev. 1 (1981); Comment, *The Strict Good Faith Standard—Fiduciary Duties to Minority Shareholders in Close Corporations,* 33 Mercer L.Rev. 595 (1982); 30 Drake L.Rev. 679 (1981). *See also* the Commentary to § 6 of the ABA's Model Business Corporation Act (the corporate share acquisition provision) found in 1 *Model Business Corporation Act Annotated* 254 (W. Scott 2d ed. 1971) ("[m]inority shareholders are protected from abuse [where the shares of particular shareholders only are purchased] by traditional common law principles of fraud and the fiduciary obligation

of management and controlling stockholders to the minority").[3]

From the standpoint of Charles Jr. and Murphy as directors, it is well settled in Maryland that they owe a fiduciary duty to Envelope Co. and its shareholders. For general statements *see, e.g., Merchants Mortgage Co. v. Lubow*, 275 Md. 208, 339 A.2d 664 (1975); *Parish v. Maryland & Virginia Milk Producers Ass'n*, 261 Md. 618, 277 A.2d 19, *cert. denied*, 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971); *Pritchard v. Myers*, 174 Md. 66, 197 A. 620 (1938); *Coffman v. Maryland Publishing Co.*, 167 Md. 275, 173 A. 248 (1934); *Booth v. Robinson*, 55 Md. 419 (1881); *Cumberland Coal & Iron Co. v. Parish*, 42 Md. 598 (1875); *Levin v. Levin*, 43 Md.App. 380, 405 A.2d 770 (1979); *Martin Marietta Corp. v. Bendix Corp.*, 549 F.Supp. 623 (D.Md.1982); *Lawson v. Baltimore Paint & Chemical Corp.*, 347 F.Supp. 967 (D.Md.1972); Miller, *The Fiduciary Duties of A Corporate Director*, 4 U.Balt.L.Rev. 259 (1975). *See also* § 2–405.1. Directors must demonstrate the fairness of a transaction between themselves and the corporation. *See, e.g., Chesapeake Constr. Corp. v. Rodman*, 256 Md. 531, 261 A.2d 156 (1970); *Ross Transport, Inc. v. Crothers*, 185 Md. 573, 45 A.2d 267 (1946). Directors may not waste corporate assets. *Devereux v. Berger*, 264 Md. 20, 284 A.2d 605 (1971); *Parish v. Maryland & Virginia Milk Producers Ass'n, supra; Waller v. Waller*, 187 Md. 185, 49 A.2d 449 (1946); *Levin v. Levin, supra. See also* § 2–315. Directors must prove a proper corporate purpose for, and the fairness of, exchanges and issuances of stock affecting corporate funds and control. *Cummings v. United Artists Theatre Circuit, Inc.*, 237 Md. 1, 204 A.2d 795 (1964); *Ross Transport, Inc. v. Crothers, supra; First Mortgage Bond Homestead Ass'n v. Baker*, 157 Md. 309, 145 A. 876 (1929); *Mountain Manor Realty v. Buccheri*, 55

---

**3.** These precedents from other jurisdictions are cited to illustrate recognition of the duty and not to indicate approval of the specific holdings in each case.

Md.App. 185, 461 A.2d 45 (1983). The remedy common to these cases for breach of the directors' obligations is voiding the transaction. *See, e.g., Chesapeake Constr. Corp. v. Rodman; Ross Transport, Inc. v. Crothers,* both *supra.*

Toner's "equal opportunity" argument lies beyond our prior decisions. To appellant "equal opportunity" means a duty on the majority/directors to cause Envelope Co. to offer to purchase her nonvoting shares based solely on the fact that the corporation purchased the nonvoting shares of another. The argument rests heavily on three cases, with the principal analysis to be found in *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 328 N.E.2d 505 (1975), a case involving a closely held corporation.

The corporation had been purchased as a going business by Harry C. Rodd (Rodd) and Joseph Donahue (Donahue). They had worked for the corporation when it was owned by a parent corporation. Rodd was general manager, and Donahue had been promoted from a laborer's job eventually to plant superintendent, and corporate vice president by 1955. Over the years Rodd had purchased 200 shares of the corporation's stock from the parent and Donahue had purchased 50 shares, in all instances at $20 per share. In 1955 the corporation bought the shares owned by its parent for $135,000, of which $75,000 was cash, obtained in large part from a loan to the company by Rodd who had mortgaged his home. Rodd was the dominant influence in the company. Eventually his two sons entered the business. One became corporate vice president and in 1964 the other replaced Donahue as plant superintendent. By 1970 Rodd was 77 years old and Donahue was dead. Rodd, through a program of gifts to his three children, had reduced his holdings to 81 shares. His sons wanted him to retire. Rodd and his children agreed upon a plan under which each child purchased two shares of stock, Rodd gave ten shares to each child, and the corporation purchased Rodd's remaining 45 shares for $800 a share, a figure which one son testified reflected book and liquidating value. At this time

45 of the Donahue shares were owned by Donahue's widow and five by his son. They sued the corporation and Rodd's children and lost in the trial court. The Supreme Judicial Court of Massachusetts, however, directed entry of a decree ordering Rodd Electrotype to purchase the Donahue stock or Rodd to remit the purchase price paid for his shares, plus interest.[4]

The Court classified the company as a close corporation, but there was no Massachusetts statute defining what a close corporation was or treating specially the legal problems of the closely held corporation. The Court "deem[ed] a close corporation to be typified by: (1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation." *Id.* at 586, 328 N.E.2d at 511. The opinion then reviewed the various ways in which the minority in a close corporation may be oppressed by the majority without having any ready market for minority shares. "Because of the fundamental resemblance of the close corporation to the partnership, the trust and confidence which are essential to [that] scale and manner of enterprise, and the inherent danger to minority interests in the close corporation," the Court said "that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another." *Id.* at 592–93, 328 N.E.2d at 515 (footnotes omitted). Moreover, "[w]hen the corporation reacquiring its own stock is a close corporation, the purchase is subject to the additional requirement ... that the stockholders, who, as directors or controlling stockholders, caused the corporation to enter into the stock purchase agreement, must have acted with

---

4. Toner does not seek rescission as alternative relief in her complaint in this case. Indeed she does not even sue the members of the Elma Branch, who received the consideration from Envelope Co. when it purchased their nonvoting stock and who would be indispensable parties defendant in an action for rescission.

the utmost good faith and loyalty to the other stockholders." *Id.* at 598, 328 N.E.2d at 518.

The Court then applied those principles to the specific case before it and ruled:

> To meet this test, if the stockholder whose shares were purchased was a member of the controlling group, the controlling stockholders must cause the corporation to offer each stockholder an equal opportunity to sell a ratable number of his shares to the corporation at an identical price. [*Id.* (footnote omitted).[5]]

In support of her "equal opportunity" argument, Toner also cites another case which imposed an obligation on a close corporation to purchase the complainant's stock as an alternate remedy where a selective stock purchase from another was held to violate the complainant's rights. *Comolli v. Comolli*, 241 Ga. 471, 246 S.E.2d 278 (1978). Until his death in 1956, C. Comolli controlled the Comolli Granite Company, a closely held family business which he founded. His eldest son, Felix, then became general manager and president of the company. In 1974, Louis, another son, was elected president and general manager. The company stock at that time was owned by Felix (375 shares), Louis (375 shares), and Mario, a third son (250 shares). On Mario's death, Louis and Felix each sought to purchase Mario's shares from his widow, Christine. Christine sold 10 shares at $800 per share to Louis. Thereafter, Louis set in motion a purchase by the corporation of Christine's remaining 240 shares at $800 per share. The repurchase ultimately was approved by the company's board of directors consisting of Louis, his wife, his son, and the company bookkeeper, who had replaced Christine as director. The corporation borrowed to finance the purchase.

---

5. In the omitted footnote the Court excluded from its holding situations in which the charter, by-laws, or a stockholders' agreement gave advance consent to proceeding without "equal opportunity." The Court also recognized there could be unanimous ratification of an unequal opportunity.

Felix sued. In count 2 of his complaint he challenged the corporate purchase as "a breach of the directors' fiduciary duty." *Id.* at 472, 246 S.E.2d at 280. The lower court agreed, granting a summary judgment rescinding the corporate transaction with Christine.

On appeal, the Supreme Court of Georgia held that the directors violated their duty by using corporate funds to assure control of the corporation by one majority purchaser-shareholder, Louis. The Court concluded:

Under the circumstances here, ... good faith requires the directors to authorize a corporate purchase of Felix' stock at the same price and the same terms given to Christine. In the event the corporation is not legally authorized to do so, or elects not to do so, the corporate purchase of Christine's stock was invalid. [*Id.* at 475, 246 S.E.2d at 281.]

The Court reasoned that an across-the-board offer would permit other shareholders to liquidate their investments in the close corporation and would eliminate any possible preferential distribution of corporate assets. The decision of the lower court was reversed without prejudice to the summary judgment as to count 2 because the record did not reflect whether the corporation had offered to purchase Felix's stock on the same terms.

*Tillis v. United Parts, Inc.,* 395 So.2d 618 (Fla.Dist.Ct. App.1981) held that the minority stockholder's complaint stated a cause of action where majority shareholders/directors had authorized a purchase by the close corporation of stock from themselves at an above-market price.[6] In reliance on *Donahue* the court reasoned that

[u]nless an equal opportunity to sell is given all stockholders, the purchase of shares in a close corporation by controlling stockholders from themselves for the account of the corporation constitutes a preferential distribution

---

6. The opinion does not explain how the shares had a market value. *Cf. Donahue v. Rodd Electrotype Co., supra* (by definition of a close corporation there is no market for its shares).

of corporate assets and a relative advantage over minority stockholders—the turning of corporate funds to personal use—inconsistent with a fiduciary duty. [*Id.* at 619–20.]

■ The common denominator of the three cases reviewed above is their treatment of selective purchase as a per se breach of duty. While we recognize that the majority/directors can violate their duty in the context of causing a selective corporate purchase of its shares, any conclusion that the majority/directors have breached their obligations should be based on all of the relevant facts. These include the purpose of the purchase in the business setting prevailing when the decision to purchase was made. That is the approach to these problems under current Maryland law.

This Court has found no breach of duty owed by majority shareholders to the minority on facts analogous to the case now before us. *Baker v. Standard Lime & Stone Co., supra,* 203 Md. 270, 100 A.2d 822, involved, *inter alia,* a purchase by the corporation of its own shares which was challenged by minority stockholders on the ground that corporate control thereby shifted. The corporation involved in *Baker* was a family-owned business. In 1946 certain of the stockholders had desired to dispose of some of their stock in order to diversify investments and to have liquidity for estate taxes. The shareholders authorized the creation of preferred stock which was sold to a life insurance company. Using the proceeds of that sale the corporation purchased the common stock without any controversy arising. Again in 1950 a similar financing took place. One of the shareholders, Holmes Baker, had died, and his executors approached the corporation to have it purchase the common stock held in his estate, certain common stock which the decedent had held as trustee of his father's estate, and the common stock owned by the decedent's sister. The stock to be purchased totaled 7,992 shares out of a total of 78,334 shares of common stock outstanding. Seventy-one per cent of the outstanding common stock voted in favor of the charter amendments necessary to effect the plan. Al-

though the plaintiffs' common stockholdings increased from 14.79% to 16.47% as a result of the corporate purchases, the interests of three other common stockholders increased in the aggregate from 46.9% to 52.23%.

The plaintiffs sought a decree requiring the corporation to purchase their common stock at its fair value or, alternatively, a rescission of the purchases and cancellation of the charter amendments. This Court, affirming a dismissal, reasoned:

We may assume that if the plan were shown to be illegal, *ultra vires* or fraudulent, it might be set aside by a court of equity. *Shaw v. Davis*, 78 Md. 308, 316. We may also assume that an equity court may set aside a transaction whereby majority stockholders use their voting power for their own benefit, for some ulterior purpose adverse to the interests of the corporation and its stockholders as such. *Cooperative Milk Service v. Hepner*, 198 Md. 104, 114, 81 A.2d 219, 224. We have no such case here. It is manifest that the purchase of the shares was beneficial to the company. The appellants concede that the price of $95 per share was less than its full value. The advantageous bargain enured to the benefit of the appellants equally with the other holders of the Company's common stock. The record shows clearly that the plan did not originate with the individual appellees. The offer to sell was put forward by stockholders who desired to sell because of their personal investment problems. The Company offered to buy the appellants' shares at the same price but they declined.

. . . .

It is always true that the purchase and retirement of some shares of common stock necessarily have the effect of increasing the proportionate voting power of all the other holders of common stock. But the appellants' percentage of votes was increased in the same proportion as the individual appellees. They lost no voting power by the transaction, but were and remain minority stockholders. The fact that in the instant case the individual

appellees, collectively, gained a majority of the voting stock is not in itself a badge of fraud. Indeed, fraud is not alleged. There is no allegation or suggestion that the individual appellees were bound or committed to vote in concert for any future proposal concerning the company's affairs. The majority voting power they now possess they formerly shared with the holders of the shares retired. [203 Md. at 283–84, 100 A.2d at 829.]

Toner seizes upon *Baker*'s reference to the corporation's having "offered to buy the appellants' shares at the same price" as a recognition by this Court of an "equal opportunity" duty on a corporate majority. The quoted language, however, is not the basis of decision in *Baker*. *Baker* turned on an analysis of whether the majority had used their voting power "for some ulterior purpose adverse to the interests of the corporation and its stockholders as such." The change in control was not adverse to the interests of the minority stockholder plaintiffs in *Baker* because "[t]hey lost no voting power by the transaction, but were and remain[ed] minority stockholders." Under *Baker*, Toner cannot have suffered any injury. Toner's stock is nonvoting and is unaffected by the increase in the voting interest of Charles Jr. from 50% to 51%. Indeed, as in *Baker*, Toner's percentage interest on liquidation has been increased by Envelope Co.'s purchase, assuming that outstanding Class A and B shares participate equally in any liquidation of the company.

We do not imply that under Maryland law a court exercising equity powers could not decree corporate purchase of a minority stockholder's shares as an appropriate remedy for breach of duty owed to that stockholder. But to afford Toner that remedy on the limited facts presented thus far in this case would require us in effect to proclaim that any "close corporation's" purchase of its stock from one shareholder creates in all other holders of the same class of stock a put exercisable against the corporation.

Certainly there are circumstances under which a close corporation's purchase of its stock would be viewed as unobjectionable, unless the jurisdiction endorses a per se equal opportunity rule. For example, assume that none of the owners is active in the business. In order to retain a professional manager the owners, without consulting counsel, cause the corporation to issue to the manager stock representing 6% of all outstanding shares. There is no employment contract and the stock is unrestricted. The manager resigns and joins a competitor. In order to prevent the former manager from exercising an apparent right to inspect the corporation's books pursuant to § 2–513, a majority of the owners causes the corporation to repurchase at a fair price the shares held by the former manager. Should a nonratifying minority stockholder thereby obtain a put on the theory that the majority has, as a matter of law, violated a duty owed to the minority stockholder? We think not.

Absent a per se equal opportunity rule the statement of facts in the case before us is consistent with the controlling shareholders' having performed their duty. Nothing negates the inference that Envelope Co., prior to the transaction, had a surplus in excess of $325,000 and paid dividends.[7] Inasmuch as Elma, prior to the transaction, owned 50% of the voting stock and favored liquidation, and inasmuch as the four directors had deadlocked on the offer from Tri-State, it is consistent with the known facts that Charles Jr. and Murphy may have reasonably concluded it was in the best interest of the shareholders to prevent a possible involuntary dissolution under § 3–413 and therefore caused the corporation to participate in a buy out of the Elma Branch.[8] A strict equal opportunity rule would

---

7. Envelope Co. incurred a debt of $325,000 in order to carry out the purchase which, under the general rule of § 2–311(d) could be made only out of surplus. § 2–311(d). Further, there is no suggestion that Murphy anticipated a return on his $100,000 investment other than as an owner of stock.

8. Section 3–413(a) provides:

not even consider the evaluations, projections, and judgments involved in that possible explanation of the known facts. These factors should not be relegated to the legal dustbin.

The Supreme Judicial Court of Massachusetts agrees. In a case decided after *Donahue* that Court expressed its concern "that untempered application of the strict good faith standard enunciated in *Donahue* to cases such as the one [then before it] will result in the imposition of limitations on legitimate action by the controlling group in a close corporation which will unduly hamper its effectiveness in managing the corporation in the best interest of all concerned." *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 850, 353 N.E.2d 657, 663 (1976). There the plaintiff was one of four founders of a close corporation, an incorporated partnership. He had invested with the legitimate expectation of continued employment with the corporation as the principal means of return on his investment. When his "partners" terminated his services for, and in-

---

(a) *By stockholders with 25 percent voting power.*—Stockholders entitled to cast at least 25 percent of all the votes entitled to be cast in the election of directors of a corporation may petition a court of equity to dissolve the corporation on grounds that:

(1) The directors are so divided respecting the management of the corporation's affairs that the votes required for action by the board cannot be obtained; or

(2) The stockholders are so divided that directors cannot be elected.

(b) *By any stockholder with voting power.*—Any stockholder entitled to vote in the election of directors of a corporation may petition a court of equity to dissolve the corporation on grounds that:

(1) The stockholders are so divided that they have failed, for [a] period which includes at least two consecutive annual meeting dates, to elect successors to directors whose terms would have expired on the election and qualification of their successors; or

(2) The acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent.

(c) *By any stockholder or creditor.*—Any stockholder or creditor of a corporation other than a railroad corporation may petition a court of equity to dissolve the corporation on grounds that it is unable to meet its debts as they mature in the ordinary course of its business.

come from, the corporation, the plaintiff sued. In reversing a judgment on liability grounds for the defendants, the Court first conceded that majority shareholders in a close corporation "have certain rights to what has been termed 'selfish ownership' in the corporation which should be balanced against the concept of their fiduciary obligation to the minority." *Id.* at 850–51, 353 N.E.2d at 663. It then laid down the following rule:

> [W]hen minority stockholders in a close corporation bring suit against the majority alleging breach of the strict good faith duty owed to them by the majority, we must carefully analyze the action taken by the controlling stockholders in the individual case. It must be asked whether the controlling group can demonstrate a legitimate business purpose for its action.... In asking this question, we acknowledge the fact that the controlling group in a close corporation must have some room to maneuver in establishing the business policy of the corporation. It must have a large measure of discretion, for example, in declaring or withholding dividends, deciding whether to merge or consolidate, establishing the salaries of corporate officers, dismissing directors with or without cause, and hiring and firing corporate employees.
>
> When an asserted business purpose for their action is advanced by the majority, however, we think it is open to minority stockholders to demonstrate that the same legitimate objective could have been achieved through an alternative course of action less harmful to the minority's interest. [*Id.* at 851–52, 353 N.E.2d at 663 (citations omitted).]

In *Wilkes* the majority stockholders failed to show a legitimate business purpose for severing the plaintiff from the payroll.

■ We reject the proposition that failure to accord strict "equal opportunity" is a breach of duty by the majority for the further reason that it is inconsistent with the legislative approach to the problems of closely held corporations. We refer to the Maryland Close Corporation Title, §§ 4–101 to

–603, which was first enacted by Ch. 649 of the Acts of 1967. The statutory close corporation is a corporation which has elected close corporation status. § 4–101(b). Envelope Co., whose existence antedated the adoption of the close corporation statute, could have elected that status by unanimous stockholder action. § 4–201(b)(2)(ii). It did not do so. Thus, adoption of Toner's "equal opportunity" argument would oblige us judicially to create a close corporation subclass out of all of the general business corporations governed by Titles 1, 2, and 3. That subclass would be distinct from the legislatively created class of close corporations governed by Title 4.

From the standpoint of substance a strict equal opportunity rule is philosophically at odds with the statutory approach to disagreement among shareholders in a close corporation. We can compare the statutory approach to Toner's position by walking the subject transaction through the Maryland Close Corporation Title as if Envelope Co. had elected that status. When members of the Elma Branch agreed to sell their stock, consummation of that agreement required unanimous shareholder approval because of the absence of a shareholder agreement. § 4–503(b)(1). Toner could have objected. Significantly, however, the result of a Toner objection would not have been that Envelope Co. would have been required to purchase Toner's stock. Rather Toner's protest would have allowed the Elma Branch to require dissolution of Envelope Co. under § 4–602(b)(1)(i) unless other stockholders purchased the stock of the members of the Elma Branch at an independently appraised value pursuant to § 4–603. The Maryland Close Corporation Title thereby more closely follows an analogy to partnerships than does the strict equal opportunity theory. Under the statute disagreements are primarily resolved by corporate dissolution if the selling stockholders' shares are not purchased by other stockholders at appraised value. The statute recognizes the economic value to the sharehold-

er in a close corporation in which there is no buy-sell agreement of obtaining a contract to sell, and the statute assures the seller either the appraised value of, or a liquidation realization on, his shares. Toner seeks to convert the same situation to the advantage of one who has no contract to sell. The strict equal opportunity rule requires the purchasing corporation to buy the stock of one with whom it has no contract in addition to the stock which the corporation agreed to buy. The rule Toner urges is a substantial departure from the resolution adopted by the Maryland statute for closely held corporations.

Further, in cases in which the consideration to be paid for shares which the corporation agrees to purchase exhausts the corporate surplus, a rule which requires the corporation additionally to purchase at the same price the shares of a dissenting minority stockholder results in a proration of the available consideration between the contract purchase and the dissident's put. Such a rule ignores whatever corporate purpose, if any, the transaction as structured may have had. It can result in rescission of the stock purchase which the directors deemed to be advantageous. In our view it is better to analyze whether the minority's rights have been infringed by looking to all of the facts rather than to look only to whether the corporation has honored a conceptually equitable, but perhaps practically unworkable, rule of strict equal opportunity.

■ For these reasons the answer to certified question No. 1 is "No." The second certified question, which asks whether the allegations of Toner's complaint stated a cause of action for recovery under the equal opportunity doctrine, is thereby moot.

CERTIFIED QUESTIONS ANSWERED AS ABOVE SET FORTH.

COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEES.