UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JOHN W. LYON,

*Plaintiff-Appellee,*

v.

LARRY A. CAMPBELL,

*Defendant-Appellant,*

and

EDWARD W. STORKE; ROBERT B. COOK,

*Defendants.*

No. 01-1694

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, Chief District Judge.
(CA-98-1129-S)

Argued: February 28, 2002

Decided: March 28, 2002

Before WILKINSON, Chief Judge, and NIEMEYER and
MICHAEL, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Gerard Patrick Martin, MARTIN, SNYDER & BERN-
STEIN, P.A., Baltimore, Maryland, for Appellant. David Schertler,

COBURN & SCHERTLER, Washington, D.C., for Appellee. **ON BRIEF:** Steven F. Wrobel, MARTIN, SNYDER & BERNSTEIN, P.A., Baltimore, Maryland; Thomas J. Zagami, HODES, ULMAN, PESSIN & KATZ, P.A., Towson, Maryland, for Appellant. Barry Coburn, COBURN & SCHERTLER, Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

### OPINION

PER CURIAM:

John Lyon sued Larry Campbell, his former business partner, claiming that Campbell breached his fiduciary duty to Lyon by retaining for himself the entire proceeds from a sale of property owned by a corporation in which the two men were equal, 50 percent shareholders. Initially, the district court granted summary judgment to Campbell based on the business judgment rule and the doctrine of unclean hands. Lyon appealed, and we reversed and remanded for further proceedings. On remand, the district court held a two-day bench trial, found that Campbell had breached his fiduciary duty, and imposed a constructive trust on the proceeds of the sale. Campbell now appeals, arguing that the district court erred in finding a breach of fiduciary duty and that in no event is Lyon entitled to equitable relief because he has unclean hands. We affirm the judgment awarded to Lyon.

I.

Lyon and Campbell became business partners sometime around the early 1970s. Sometime in the 1980s their business relationship began to deteriorate, and for years now the two have been invoking the jurisdictions of various state and federal courts in their efforts to complete their messy split up. *See, e.g.*, *Campbell v. Lyon*, 26 Fed. Appx. 183 (4th Cir. 2001) (per curiam); *Lyon v. Campbell*, 1994 WL 369453 (4th Cir.) (per curiam); *Lyon v. Campbell*, 596 A.2d 1012 (Md. 1991);

*Lyon v. Campbell*, 707 A.2d 850 (Md. Ct. Spec. App. 1998). At trial the district court was faced with the unenviable task of sorting out 15 years of alleged debts, debt repayments, and business transactions, many of which were unsupported by proper documentation. The court then sought to apply the various doctrines of corporate law to those facts it could discern. As the district court noted, Lyon and Campbell behaved like "people in kindergarten in terms of observing [corporate] formalities," and thus reconstructing the legal relationships and liabilities between the two is "sort of like trying to rebuild the Titanic, [an] analogy . . . chosen for a reason, from a deck chair and a billiard table." With this introduction, we turn to the facts of this case.

Lyon and Campbell were equal, 50 percent shareholders in, among other things, a corporation called ICE. ICE, in turn, was a holding company for other Lyon-Campbell ventures, two of which were L-C, Inc. and Excavation Corporation, Inc. (EC). Through L-C, Lyon and Campbell purchased a parcel of property known as Oxen Cove in 1972 for around $500,000. The Oxen Cove property was an 80-acre tract of land located partially in Maryland and partially in the District of Columbia. During the 1970s EC had taken out various bank loans. Lyon and Campbell had personally guaranteed these loans, and L-C's Oxen Cove property was pledged as a security interest on the loans. When EC went bankrupt, Dominic Antonelli, a business associate of Lyon, agreed to purchase the notes for these loans from the bank. At trial Lyon and Antonelli both testified that between 1984 and 1990 Lyon paid Antonelli the entire amount owed on the EC debt. The two testified that Campbell was kept in the dark about this repayment because Antonelli planned to seek repayment from Campbell of half of the debt and then return that money to Lyon. Campbell claims that Lyon never paid Antonelli anything, and indeed neither Lyon nor Antonelli were able to produce any documentary evidence of Lyon's repayment of the loan. In fact, they admitted that Antonelli had not even canceled the notes, but they attributed this failure to simple carelessness. In 1990 an associate of Campbell, Joel Broyhill, paid Campbell's one-half share of the loan to Antonelli on Campbell's behalf, and Antonelli assigned the notes to Broyhill.

As noted above, business relations between Lyon and Campbell eventually became strained, and they began the long process of extricating themselves from their various ventures. By 1995 the two men

had ceased their joint business ventures except for their continued co-
ownership of ICE. The only significant remaining asset at this point
was the Oxen Cove property, still held by ICE's subsidiary, L-C. In
early 1995 Lyon was approached by a representative of the Correc-
tions Corporation of America (CCA) about purchasing the Oxen Cove
property. Lyon relayed this information to L-C's board of directors,
which consisted of himself, Campbell, and Edward Storke. In order
to free up Oxen Cove for a potential sale, Campbell repaid Broyhill
the amount Broyhill had paid on the Antonelli debt, and in 1996
Broyhill released the Oxen Cove property from the security interest
he held as owner of the EC debt.

L-C eventually sold Oxen Cove to CCA for $4 million. Prior to the
sale Campbell and Storke discovered that Lyon had pledged $1 mil-
lion of his share of any proceeds from a potential Oxen Cove sale to
his bankruptcy trustee. Because of this conflict of interest, Campbell
and Storke voted to remove Lyon from the L-C board and replace him
with Robert Cook. Campbell and the other L-C board members pro-
ceeded to freeze Lyon out of the Oxen Cove negotiations and even-
tual sale, refusing to provide him with information related to the sale.
Several days before the sale the L-C directors agreed to pay $1 mil-
lion of any sale proceeds to Lyon's bankruptcy trustee to settle all
claims the trustee might have had against L-C and Oxen Cove. After
the sale the board distributed $1 million of the proceeds to the bank-
ruptcy trustee and the remainder to Campbell; the distribution to
Campbell was supposedly to reimburse him for his personal payment
of the EC debt.

Lyon brought this diversity action in federal court against Camp-
bell for breach of fiduciary duty, claiming that the sale proceeds
should have been distributed equally between the two of them as
equal shareholders in ICE. The district court granted summary judg-
ment to Campbell on the basis of the business judgment rule. We
reversed and remanded, explaining that the evidence created a factual
dispute as to whether Campbell had breached his fiduciary duty. On
remand the district court noted for the first time that Lyon had failed
to properly certify his complaint pursuant to Fed. R. Civ. P. 23.1 and
thus could not maintain a shareholder derivative action. "[B]efore a
stockholder will be permitted to maintain a suit for injury to the cor-
poration, he must allege and prove that he requested the directors to

institute suit in the name of the corporation, and they refused." *Waller v. Waller*, 49 A.2d 449, 453 (Md. 1946). Rule 23.1 establishes the procedures necessary to properly allege such a request and refusal. Lyon conceded that he had not met the requirements of Rule 23.1, and thus he could not maintain a shareholder derivative suit. The district court then proceeded to a bench trial solely on a direct breach of fiduciary duty claim. The court found a breach of fiduciary duty by Campbell and imposed a constructive trust on the proceeds of the Oxen Cove sale. Campbell now appeals. We review the district court's factual findings for clear error and its legal conclusion de novo. *Anita's New Mexico Style Mexican Food, Inc. v. Anita's Mexican Foods Corp.*, 201 F.3d 314, 316 (4th Cir. 2000).

## II.

Because Lyon cannot maintain a shareholder derivative suit against Campbell, we must first determine whether he can maintain some sort of direct claim for breach of fiduciary duty. If he can, we must then determine whether the district court property placed the burden on Campbell to justify the fairness of the distribution of the proceeds and whether Campbell in fact met such a burden. We address these issues in turn. The parties agree that Maryland law applies.

As a preliminary matter we address Campbell's claim that he suffered unfair surprise and prejudice because the district court at the last minute transformed Lyon's breach of fiduciary duty claim into a claim for imposition of a constructive trust. A constructive trust is an equitable remedy, not a cause of action in and of itself. *See* 21 Maryland Law Encyclopedia *Trusts* § 61 (1997) ("A constructive trust . . . is a mere remedy to which equity courts resort in granting relief."). It is true that in its pretrial order the district court characterized the cause of action for trial as that of "Imposition of a Constructive Trust." However, in its oral ruling the district court explained that "the appropriate remedy for breach of fiduciary duty [between shareholders], in such circumstances, is . . . the imposition of a constructive trust." We conclude that despite any confusion created by the pretrial order, the district court properly tried the case based on the cause of action of breach of fiduciary duty and then imposed the remedy of a constructive trust. Campbell's argument that the district court allowed the case to be tried on an improper theory is therefore misplaced.

A.

Ordinarily, Lyon's failure to properly plead a shareholder derivative claim would be the end of his breach of fiduciary duty claim. However, Maryland has recognized that in certain circumstances, shareholders in a small, closely held corporation owe each other a fiduciary duty apart from the fiduciary duty owed by the directors to the corporation. *See Toner v. Baltimore Envelope Co.*, 498 A.2d 642, 647 (Md. 1985). Here, ICE and L-C were small, closely held corporations with only two shareholders, Lyon and Campbell. The shareholders served on the board of directors and participated in the day-to-day management of corporate affairs, often disregarding corporate formalities in the course of such management. Additionally, at the time of the Oxen Cove sale Campbell had achieved de facto control over the corporation. Following Lyon's removal from the L-C board, Campbell and the other directors refused to give Lyon any information or allow him any input regarding the Oxen Cove sale, effectively freezing Lyon out of L-C's affairs. Under these circumstances, Campbell, in his capacity as shareholder, owed his co-shareholder Lyon a fiduciary duty. *See id.* at 647-52; *Cooperative Milk Service Inc. v. Hepner*, 81 A.2d 219, 224 (Md. 1951); *see also Donahue v. Rodd Electrotype Co. of New England*, 328 N.E.2d 505 (Mass. 1975). Accordingly, Lyon can maintain a breach of fiduciary duty claim against Campbell.

B.

In most cases the burden of establishing a breach of fiduciary duty lies with the party asserting the breach, in this case Lyon. However, "transactions between a corporation and its officers or directors are always closely scrutinized." *Lynch v. Buchanan*, 377 A.2d 592, 596 (Md. Ct. Spec. App. 1977). Significantly, when a director or officer enters into a contract or transaction with the corporation such that his or her personal interest differs from that of the corporation, "the burden of proving that the contract is fair, adequate and equitable is upon the officer or director." *Chesapeake Constr. Corp. v. Rodman*, 261 A.2d 156, 158 (Md. 1970). This principle applies to dominant shareholders as well as to officers and directors. *Lynch*, 377 A.2d at 595. The burden of proving fairness shifts to the "director or shareholder once it is shown that he has dealt in a way to perfect his own interest."

*Id.* In this case the district court found that once Lyon had been frozen out of L-C's dealings, Campbell became the de facto controlling shareholder and effectively dominated the L-C board. It is undisputed that the board distributed about three-fourths of the proceeds of the Oxen Cove sale directly to Campbell. In this situation, Campbell, the recipient of these proceeds, clearly faced a conflict between his own personal interests and those of the corporation. Because Campbell, acting as de facto controlling shareholder, caused the corporation to distribute the Oxen Cove sale proceeds to him at a time when he dominated the board, he bears the burden of proving that this self-interested transaction was fair and equitable. To establish this, Campbell must show that he was a bona fide creditor of L-C and thus was entitled to payment prior to the distribution of the proceeds to the shareholders, namely himself and Lyon.

At the time the board distributed the Oxen Cove sale proceeds to Campbell, the board justified the distribution as a repayment of money owed Campbell by L-C. Campbell concedes that there is no clear documentary evidence proving that L-C owed him anything. Before the district court and on appeal Campbell explains the source of this supposed obligation as follows. As mentioned above, L-C's property, Oxen Cove, was pledged as a security interest for the loans taken out by EC and personally guaranteed by Campbell and Lyon. Campbell's lawyer explained that "[i]f Mr. Campbell hadn't stepped up to the plate [and paid Antonelli] . . . someone could have foreclosed on L-C's properties, taking it to satisfy the debt, and L-C wouldn't have had any property to sell in 1996." In response to a question by the district court, Campbell's lawyer clarified that "L-C didn't owe anybody." The key, rather, was that "L-C property was pledged to secure the debts." Campbell argues that he is entitled to the proceeds of the Oxen Cove sale because if he had not paid off the debt, L-C could not have realized those proceeds.

Campbell's argument rests on a failure to understand the difference between a debt obligation and a security interest. The fact that L-C's property was subject to a security interest on the EC loan does not establish that L-C was itself liable to Campbell for paying off this loan. L-C undoubtedly benefitted from the release of this security interest on its property, but this benefit does not give rise to a legal liability. When property is pledged as security for a debt, the owner

of the pledged property does not thereby become liable on the debt. Likewise, while the release of the security interest benefits the owner of the pledged property, the release does not trigger any legal obligation on the part of the owner. Campbell, as a personal guarantor of EC's debt, would be entitled to reimbursement from EC for his payment of that debt. The fact that Campbell cannot recover from EC, since EC is long-since bankrupt, is of no moment. Such is the risk of personally guaranteeing a corporate debt.

Here, Campbell has proven only that L-C was subject to losing the Oxen Cove property (up to the outstanding value of the EC debt), not that L-C was liable on the loan. Accordingly, Campbell has failed to prove that he was a creditor of L-C. The district court thus concluded that Campbell failed to carry his burden as an interested party in this transaction to show "a sufficient case of justice, equity, or fairness, to allow him to retain the entire net proceeds of the Oxen Cove sale." We agree, and we affirm the district court's determination that Campbell breached his fiduciary duty to Lyon when he caused the net proceeds of the Oxen Cove sale to be distributed exclusively to himself.

III.

Aside from the merits of the case, Campbell argues that Lyon should be barred from any equitable relief based on the doctrine of unclean hands. The district court rejected this argument, and we review the court's decision not to apply the doctrine for abuse of discretion. *Hicks v. Gilbert*, 762 A.2d 986, 990 (Md. Ct. Spec. App. 2000). According to Campbell, the district court found that Lyon and Antonelli had lied when they testified that Lyon fully repaid Antonelli the EC debt. There is much evidence calling Lyon's and Antonelli's testimony into doubt. For example, Lyon's annual financial statements reflected a large debt owed to Antonelli that did not diminish over the years that Lyon supposedly paid off the EC debt. Indeed, at one point the district court commented that "I don't believe for a minute that [Lyon] paid Campbell's half. I think that's just a lie." In light of this finding of perjury, Campbell argues, the district court should have barred Lyon from any equitable relief based on the doctrine of unclean hands.

As we noted in the first appeal of this case, the doctrine of unclean hands permits a court to withhold equitable relief from a party who

is guilty of "willful wrongdoing in relation to the controversy before it." *Manown v. Adams*, 598 A.2d 821, 825 (Md. Ct. Spec. App. 1991), *vacated on other grounds*, 615 A.2d 611 (Md. 1992). We explained that the doctrine applies only to willful wrongdoing that relates to the claim being litigated. We held that Lyon's failure to disclose his conflict of interest in the potential Oxen Cove sale was not sufficiently related to his breach of fiduciary duty claim to warrant application of the doctrine.

As to Lyon's trial testimony, the district court determined that any false testimony was collateral to the central issue in the case and declined to apply the doctrine of unclean hands. Campbell argues that while the willful wrongdoing must relate to the controversy before the court, perjury during the actual trial proceedings is always a sufficient reason to apply unclean hands, regardless of whether the case ultimately turns on the subject matter of the perjury. We acknowledge that perjury during a trial proceeding may warrant different treatment than willful wrongdoing outside the judicial proceedings. Nonetheless, even if the district court might have been justified in applying the doctrine of unclean hands based on Lyon's false testimony, the court was not compelled to do so. Application of the doctrine of unclean hands is largely in the discretion of the district court, *see Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815 (1945), and the district court did not abuse its discretion by refusing to apply the doctrine here.

## IV.

In conclusion, we affirm the district court's determination that Campbell failed to show that he was entitled to keep the net proceeds of the Oxen Cove sale. Additionally, the district court did not abuse its discretion in declining to apply the doctrine of unclean hands to bar Lyon's recovery. The judgment of the district court is therefore

*AFFIRMED.*