662 F.2d 371
 Jack FARBER, personally and as a shareholder of Servan Land
Corporation, Inc., on behalf of the Corporation,
Plaintiff-Appellant,
v.
SERVAN LAND COMPANY, INC., Charles S. Serianni and A. I.
Savin, Defendants-Appellees.
 No. 79-4014.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Nov. 30, 1981.
 Smathers & Thompson, Cromwell A. Anderson, Keith E. Hope, Miami, Fla., for plaintiff-appellant.
 Horton & Perse, Mallory H. Horton, Starr W. Horton, Miami, Fla., for defendants-appellees.
 On Appeal from the United States District Court for the Southern District of Florida.
 Before TJOFLAT, HATCHETT and THOMAS A. CLARK, Circuit Judges.
 TJOFLAT, Circuit Judge:
 
 
 1
 This is the second appeal of a stockholder's derivative suit against two corporate directors for preemption of a corporate opportunity. We find that the directors violated their fiduciary duties to the corporation and that they are liable for damages. We remand the case to the district court so that damages may be assessed.
 
 
 2
 * In 1959, Charles Serianni, a Broward County, Florida, businessman, initiated a plan to build and operate a golf course and country club near Ft. Lauderdale. With the assistance of several other investors he formed a corporation, the Servan Land Company, Inc. (the corporation), which was to own and operate the enterprise. The corporation acquired 160 acres of land on which to build the course. Shortly thereafter it acquired from James Farquhar twenty additional acres abutting the golf course, to be used as a dump site for top soil and as a nursery.
 
 
 3
 Serianni held 180 shares of the corporation's stock and served as President of the corporation throughout its existence. A. I. Savin, a resident of Connecticut, owned 2161/2 shares of stock, and served as the corporation's Vice President. There were eight other stockholders, including Jack Farber, the plaintiff in this action. Farber owned sixty shares.
 
 
 4
 At one point, the corporation sold four of the twenty acres it had acquired from Mr. Farquhar to BD&L Corporation, which built a sixty-eight-unit lodge on the land. When BD&L was unable to meet its obligations, Servan Land bought the land and lodge, and subsequently held and operated it through a wholly-owned subsidiary.
 
 
 5
 On several occasions the directors and stockholders discussed the possibility of acquiring more land abutting the golf course, but the corporation took no action. Then, at the 1968 annual stockholders' meeting, Servan Land Company director and stockholder Hamilton Forman informed his associates that James Farquhar was willing to sell 160 acres of abutting land to the corporation. This land was suitable for use as an additional golf course. At the time he made the statement, the stockholders were discussing refinancing the mortgage on the country club in order to obtain funds to redeem the corporation's preferred stock and pay debts owed to several stockholders. Forman suggested that the proceeds the stockholders received from the redemption could be used to buy additional stock in the corporation, thus generating the funds necessary for the corporation to acquire the Farquhar property. According to the corporate minutes, "(t)he stockholders seemed to feel that this possibility should certainly be investigated and would be made financially feasible by the refinancing...." Minutes of the Annual Joint Meeting of the Board and Stockholders of Servan Land Company, April 1, 1968, at 3. The stockholders decided, however, to vote on the refinancing question without an amendment providing for purchase of the property. They passed the motion to refinance.
 
 
 6
 A few months later, Serianni and Savin met with James Farquhar and negotiated to buy, in their individual capacities, the same 160 acres abutting the golf course that had been discussed at the corporation's annual stockholders' meeting. They closed the transaction in March 1969.
 
 
 7
 The minutes of the 1969 annual stockholders' meeting, held the following month, indicate no discussion of or reference to Serianni and Savin's purchase. During the following year Farber learned of the purchase from a third party, and at the 1970 annual stockholders' meeting, he inquired about it. Savin and Serianni acknowledged the purchase, but at this point the evidence varies. The official corporate minutes indicate that the stockholders discussed the purchase and found no impropriety, and that "(a) motion to approve this land purchase by Mr. Serianni and Mr. Savin individually was then moved, seconded and approved by everyone at the meeting, except (Mr. Farber's proxy)." Minutes of Special Meeting of the Stockholders of Servan Land Company, Inc., May 9, 1970, at 2. Farber, however, having been at odds with the majority stockholders for some time, had sent a court reporter to the meeting, and the court reporter's transcript reports no motion to ratify Serianni and Savin's purchase.
 
 
 8
 Three years later, in 1973, Serianni, Savin and the corporation entered into an agreement with a purchaser to sell as a package the corporation's assets and the 160 acres of adjoining land Serianni and Savin had bought; each contract of sale was conditioned upon execution of the other. Of the aggregate sales price, the defendants allocated $5,000,000 to the corporation and $3,353,700 to Savin and Serianni, though this division was not based on any appraisal of the respective properties.
 
 
 9
 At a special directors' and stockholders' meeting, all the members of the corporation but Farber approved the sale and voted to liquidate Servan Land Company. After the sale was completed Farber brought a stockholders' derivative suit in the district court, based on diversity jurisdiction, alleging that Savin and Serianni had preempted a corporate opportunity by acquiring the 160 acres adjacent to the golf course. He also sought appointment of an appraiser to determine the proper allocation of the purchase price.
 
 
 10
 The district court, sitting without a jury, announced its findings of fact and conclusions of law at the end of trial.[1] It found, inter alia, that the initial investors had created the golf course and country club "as a bit of an ego trip and partially out of vanity considerations," Record Excerpts at 60, because they were tired of waiting for starting times at other golf courses, and wanted a course of their own when they were in the Ft. Lauderdale area. The court found that Serianni had been the "driving force," id., of the venture from its inception, though apparently this was at least partly due to the lack of interest of the other stockholders or because most of the others lived in distant states. The court then noted that Serianni had engaged in "questionable tactic(s)" in running the corporation, id. at 61, but that "this golf course was not operated with an eye to investment in the sense that many of the real estate promotional ventures have been developed in this country." Id. at 62. The court continued:
 
 
 11
 Mr. Forman's testimony is persuasive, that the golf course should not have been built without acquiring all the perimeter land. It is persuasive in the sense of the business aspects of the development; but it is also supportive of the Court's earlier findings that this matter was not originally designed exclusively as a real estate venture but had other goals which have been previously indicated.
 
 
 12
 The Court finds that the possibility of real estate development was certainly present. For example, Mr. Forman testified, via deposition, that scarcely ever a meeting of the stockholders occurred without discussing the acquiring of additional property of Mr. Farquhar.
 
 
 13
 Mr. Farber, the plaintiff, minority stockholder, became somewhat disenchanted early in the operation, primarily because he felt the operation was not being conducted in the soundest manner possible from a business point of view; and that may have been true. Even if it weren't, that may have been consistent with the whole idea of this operation.
 
 
 14
 Id. at 62-3. The court then noted that the corporation had acquired an extra twenty acres abutting the golf course from Mr. Farquhar in 1960, and, subsequently, had acquired and operated the lodge. It then acknowledged the stockholders' interest in Mr. Farquhar's 160 acres at the 1968 meeting[2] but noted that they had not taken further action to obtain the land.
 
 
 15
 Following these observations, the court stated:
 
 
 16
 The Court finds that it was incumbent upon Mr. Serianni and Mr. Savin at that time, in their position, and under the circumstances, to have called a special meeting of the stockholders and to have advised them that they had this possibility of purchase and give the stockholders a chance to take corporate action to acquire the land or to defer in favor of Mr. Serianni and Mr. Savin to make an individual purchase.
 
 Id. at 65.[3]
 It continued:
 
 17
 The Court might observe that there is little doubt but what the stockholders, with the exception of Mr. Farber, would have been delighted to have deferred to Mr. Serianni and Mr. Savin and wished them well.
 
 
 18
 The Court further finds that there is an obvious benefit to the corporation by the fact that Mr. Serianni and Mr. Savin did purchase the 160 acres, and at the time the corporate assets were sold, the 160 acres in question was available as an aggregate of assets and real estate, so that the entire package was considerably more attractive to purchasers.
 
 
 19
 Id. at 65-66. Finally, the court found that Farber was entitled to an appraisal to determine whether the corporation should have received a larger portion of the total sale price of the properties than the $5 million allocated by Serianni and Savin. It withheld final judgment pending the completion of the appraisal. From the dialogue between the court and counsel following the court's findings of fact it is clear that the court considered the question of damages to ride entirely on the results of the appraisal as requested in Count II of the complaint, and not on the existence of a breach of fiduciary duty as charged in Count I. This, apparently, was because Serianni and Savin's cooperation in selling their 160 acres as a package with the corporation's assets enhanced the overall value of the deal, thus resulting in a benefit to the corporation.[4]
 
 
 20
 The appraiser subsequently valued the corporation's properties at $4,065,915, and the Serianni-Savin property at $3,950,925. Serianni and Savin had allotted to the corporation a greater percentage of the proceeds of the sale than would have been allocated using the appraiser's figures.
 
 
 21
 Following submission of the appraisal, the district court issued a memorandum opinion, Farber v. Servan Land Co., Inc., 393 F.Supp. 633 (S.D.Fla.1974), which set forth its earlier findings and incorporated the results of the appraisal. In that opinion, the court reiterated its finding that "Serianni and Savin should have informed the directors of the opportunity to purchase Mr. Farquhar's 160 adjoining acres." Id. at 637. But the court also noted that their purchase, "worked to the distinct advantage of the corporation and not to its detriment because it enhanced the value of the major corporate asset the golf course."[5] Id. at 637-38. Further,
 
 
 22
 "the corporation ... profited ... not only because of the increased value of the golf course but because of the defendant's overvaluation of the corporate land to the detriment of the defendants' individual land....
 
 
 23
 Not only did the corporation actually profit from the personal actions of Seriani (sic) and Savin, but the 160 acres did not constitute a corporate opportunity nor was its acquisition adverse to the interests of the corporation. The mere fact that the land was adjacent to the corporate land in itself does not support a conclusion that therefore the acreage was a corporate opportunity. The property had no substantial relation to the corporation's primary purpose of operating a golf course and the individual purpose was not antagonistic to any significant corporate purpose and thus the facts do not fall within the general proposition that an officer of a corporation cannot acquire title to or an interest in property prejudicial to the corporation.
 
 Id. at 638. (citations omitted)
 
 24
 As an additional ground for finding that Farber was not entitled to recover for preemption of a corporate opportunity, the court found that "(a)ny failure to call a special meeting (to offer the purchase opportunity to the corporation) was cured by the approval of the purchase by all stockholders, except Farber's proxy, at a special meeting held May 9, 1970." Id. at 636.
 
 
 25
 Farber appealed the district court's decision, and this court vacated and remanded it for clarification, stating: "if, as seems to be clearly expressed, there was no corporate opportunity, why should, as is three times stated, Serianni and Savin have offered the 160 adjacent acres to the corporation? The holdings are inconsistent." Farber v. Servan Land Co., Inc., 541 F.2d 1086, 1088 (5th Cir. 1976). This court also questioned the district court's reliance on the theory that Savin and Serianni benefited the corporation by selling their 160 acres along with the corporation's assets. We stated:
 
 
 26
 If the corporate opportunity doctrine is otherwise applicable it is not made inapplicable by the realization of a substantial gain from a fortuitous sale of its assets at the same time as the sale of the property asserted to be a corporate opportunity to a lone buyer who would not have bought either property without the other. If a corporate opportunity existed the corporation and its stockholders would have been entitled to the profits from the sale of both parcels.
 
 Id. (Footnote omitted.)
 
 27
 On remand, the district court failed to explain why it found that Serianni and Savin had a duty to offer the opportunity to purchase the 160 acres to the corporation, but it reaffirmed its finding that "Seriani (sic) and Savin had satisfactorily sustained the burden of establishing the propriety of the transaction." Record Excerpts at 57. It stated that it based this conclusion on three grounds: "(1) the corporation, although it discussed Mr. Farquhar's abutting land ... took no action to acquire it at a previous annual meeting of the corporation; (2) the action of Seriani (sic) and Savin in purchasing the abutting land was ratified and approved by a special meeting of the stockholders on May 9th, 1973" and (3) Serianni and Savin were generous in valuing the corporation's assets above their worth when apportioning the proceeds of the package sale. Id. The third fact, the court held, indicated that the defendants were not taking advantage of the corporation. Id.
 
 
 28
 Farber appeals once again.
 
 II
 
 29
 In reviewing the district court's decision we must evaluate its resolution of four key issues: whether a corporate opportunity existed; whether the stockholders declined the opportunity by failing to act; whether the stockholders ratified Serianni and Savin's purchase; and whether the subsequent benefit the corporation received in selling its assets in conjunction with Serianni and Savin's 160 acres rectifies any wrong it might have suffered through the defendants' initial purchase of the land.
 
 A. The Existence of a Corporate Opportunity
 
 30
 In Florida, a corporate director or officer "occupies a quasi-fiduciary relation to the corporation and the existing stockholders. He is bound to act with fidelity and the utmost good faith." Flight Equipment & Engineering Corp. v. Shelton, 103 So.2d 615, 626 (Fla.1958). Because he "occupies a fiduciary relationship to the corporation, (he) will not be allowed to act in hostility to it by acquiring for his own benefit any intangible assets of the corporation .... He cannot make a private profit from his position or, while acting in that capacity, acquire an interest adverse to that of the corporation...." Pruyser v. Johnson, 185 So.2d 516, 521 (Fla.App.1966) (citations omitted). See Orlando Orange Groves Co. v. Hale, 107 Fla. 304, 312, 144 So. 674, 677 (1932).
 
 
 31
 If one occupying a fiduciary relationship to a corporation acquires, "in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence," he violates what has come to be known as the "doctrine of 'corporate opportunity'." 3 Fletcher Cyclopedia Corporations § 861.1 at 227 (rev'd ed. 1965). The standards for applying this doctrine were enunciated in Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503 (1939):
 
 
 32
 "(I)f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself."
 
 
 33
 23 Del.Ch. at 272, 5 A.2d at 511. Florida has long recognized the doctrine of corporate opportunity, see, e. g., News-Journal Corp. v. Gore, 147 Fla. 217, 222-24, 2 So.2d 741, 744-5 (1941); Seestedt v. Southern Laundry, 149 Fla. 402, 405, 5 So.2d 859, 861 (1942), and has described a corporate opportunity as a business opportunity in which the corporation has an interest for a "valid and significant corporate purpose." Pan American Trading & Trapping v. Crown Paint, Inc., 99 So.2d 705, 706 (Fla.1957). See Corr v. Leisey, 138 So.2d 795, 799 (Fla.App.1962). The opportunity need not be "of the utmost importance to the welfare of the corporation," Pan American, 99 So.2d at 706,[6] to be protected from preemption by the corporation's directors and officers. As we elaborated in the first appeal of this case, however, the opportunity must "fit into the present activities of the corporation or fit into an established corporate policy which the acquisition of the opportunity would forward." Farber, 541 F.2d at 1088.
 
 
 34
 In its initial opinion the district court found that no corporate opportunity existed:
 
 
 35
 The court finds the possibility of real estate development was contemplated by the stockholders. For example, Mr. Forman testified, via deposition, that scarcely a meeting of the stockholders occurred without discussing the acquiring of additional property from Mr. Farquhar. However, the possibility of real estate development would always be in the minds of a group of affluent businessmen. This does not mean that real estate development was actually part of the corporate purpose and the court specifically finds that real estate development was not a purpose for which the corporation was formed....
 
 
 36
 The mere fact that the land was adjacent to the corporate land in itself does not support a conclusion that therefore the acreage was a corporate opportunity. The property had no substantial relation to the corporation's primary purpose of operating a golf course and the individual purpose was not antagonistic to any significant corporate purpose and thus the facts do not fall within the general proposition that an officer of a corporation cannot acquire title to or an interest in property prejudicial to the corporation.
 
 
 37
 Farber v. Servan Land Co., Inc., 393 F.Supp. at 635, 638. We find that the district court's findings of fact do not support its legal conclusion that the opportunity to buy Farquhar's 160 acres was not a corporate opportunity. See Studiengesellschaft Kohle v. Eastman Kodak Co., 616 F.2d 1315, 1322-23 (5th Cir.), cert. denied, 449 U.S. 1015, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).
 
 
 38
 It should be noted that the district court not only found that the stockholders frequently discussed acquisition of Mr. Farquhar's land at their meetings; it also found that the stockholders had discussed this matter at the last meeting, just shortly before Serianni and Savin made their purchase, and that they had "indicated a sense of approval to the idea of acquiring abutting land from Mr. Farquhar." Record Excerpts at 65. Further, the court heard testimony that the corporation needed the land on the perimeter of the golf course, and evidence that the corporation had bought additional land from Mr. Farquhar in the past and that it had bought and operated a lodge located on part of that land. These facts make it clear that the opportunity to acquire the Farquhar land was an advantageous one that fit into a present, significant corporate purpose, as well as an ongoing corporate policy, and that the corporation had an active interest in it.[7] Accordingly, the opportunity to buy the land constituted a corporate opportunity.
 
 
 39
 B. Whether the Stockholders Declined the Opportunity
 
 
 40
 In addition to finding that no corporate opportunity existed, the district court found that if one did exist, "it was rejected by the corporation." Record Excerpts at 58. See id. at 57. The court apparently reached this conclusion because after deciding at their annual meeting that the opportunity to purchase the land should be investigated, the stockholders did not vote, at that meeting, to commit the funds available from the refinancing to purchase of the Farquhar property. See Farber, 393 F.Supp. at 635, 638. We find that this failure does not indicate a decision to refrain from pursuing the opportunity to purchase. Indeed, since the stockholders apparently lacked specific information about Mr. Farquhar's terms of sale, it would have been illogical to make a commitment of funds at that time. It is true that there is no evidence to indicate that the stockholders undertook formal investigation of the potential purchase between the time of the meeting and the time of Serianni and Savin's purchase. It should be noted, however, that Serianni was the president of the corporation and the only active director. The other stockholders customarily relied upon him to exercise the executive powers of the corporation, since most of them resided in other states. See Farber, 393 F.Supp. at 634. Because the other stockholders relied upon Serianni to initiate the investigation on the corporation's behalf, he may not now translate his own inaction into a corporate rejection of the opportunity, thus allowing him to buy the land personally. The district court's finding that the corporation rejected the opportunity is clearly erroneous.[8]
 
 C. Ratification of the Purchase
 
 41
 As another ground for its decision, the district court held that the stockholders ratified Serianni and Savin's purchase at their May 9, 1970 meeting. Farber attacks this finding on two grounds. First, he argues that it was clearly erroneous to rely on the corporate minutes, which indicated a vote to ratify, rather than on his court reporter's transcript of the meeting, which indicates no ratification attempt.
 
 
 42
 The district court received adequate evidence that the corporate minutes were valid and reliable. This left it with an issue of credibility, and this court, on appeal, cannot say that the district judge's decision to rely on the corporate minutes was clearly erroneous. See Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724, 728 (5th Cir. 1980); Galena Oaks Corp. v. Shofield, 218 F.2d 217, 219 (5th Cir. 1952); Fed.R.Civ.P. 52(a). This is especially so since official minutes of corporate meetings are generally considered the best evidence of corporate business transacted. See Gentry-Futch Co. v. Gentry, 90 Fla. 595, 608, 106 So. 473, 478 (1925).
 
 
 43
 Farber also argues that even if the ratification vote did take place, it cannot be used to prohibit his derivative action. We agree. When ratification is possible and the proceedings are proper, stockholders may sanction the act of a corporate officer or director and thus abolish any cause of action that the corporation might have against that individual. See 13 Fletcher § 5882. Not all acts may be ratified, see, e. g., Gentry-Futch Co. v. Gentry, 90 Fla. at 611, 106 So. at 479; 2 Fletcher § 5795, and the Florida courts have not indicated whether stockholders are capable of ratifying a director or officer's breach of fiduciary duty.[9] We do not need to decide whether ratification was possible here, however, because even if it was, the manner of ratification in this case renders the ratification a nullity.
 
 
 44
 According to the corporate minutes, all of the directors present at the annual meeting, except the plaintiff, voted to ratify the land purchase. Both of the purchasing directors were present, and between the two of them, they held four-sevenths of the stock. While it is true that directors ordinarily may vote their stock on measures in which they have a personal interest, see Smith v. Brown-Borhek Co., 414 Pa. 325, 334, 200 A.2d 398, 402 (1964); 13 Fletcher § 5829 at 159, most authorities agree that " '(t)he violation of their duty by corporate directors cannot be ratified by the action of those who were guilty of participation in the wrongful acts, even though they constitute a majority of the directors or of the stockholders.' " Chesapeake Construction Corp. v. Rodman, 256 Md. 531, 537, 261 A.2d 156, 159 (Md.App.1970) (quoting 19 C.J.S. Corporations § 763(b) at p. 112). See Wolf v. Frank, 477 F.2d 467, 477 (5th Cir.), cert. denied, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973); Claman v. Robertson, 164 Ohio St. 61, 128 N.E.2d 429 (1955) (ratifying majority must be disinterested); 13 Fletcher § 5882; 19 Am.Jur Corporations § 1248 at 656 (1965); 19 C.J.S. Corporations § 1016 at p. 493 (1940). See generally Chounis v. Laing, 125 W.Va. 275, 290, 23 S.E.2d 628, 637 (1942). Thus, Serianni and Savin may not bind Farber by ratifying their own inappropriate acts. Farber is entitled to bring a derivative action.
 
 D. The Effect of Benefit to the Corporation
 
 45
 Finally, in finding in favor of the defendants, the district court relied heavily on the notion that by valuing the two properties favorably for the corporation when they were sold jointly, and by selling the properties together, thus raising the value of each, Serianni and Savin benefitted the corporation. This benefit, according to the court, precluded any recovery for breach of fiduciary duty in obtaining the Farquhar acres in the first place. See Record Excerpts at 56-7; Farber, 393 F.Supp. at 636-9.
 
 As we stated in the first appeal, however:
 
 46
 If the corporate opportunity doctrine is otherwise applicable it is not made inapplicable by the realization of a substantial gain from a fortuitous sale of its assets at the same time as the sale of the property asserted to be a corporate opportunity to a lone buyer who would not have bought either property without the other. If a corporate opportunity existed the corporation and its stockholders would have been entitled to the profits from the sale of both parcels.
 
 
 47
 Farber, 541 F.2d at 1088 (emphasis added) (footnote omitted).[10]
 
 
 48
 Further, it has already been established that Serianni and Savin apportioned the proceeds of the joint sale without the benefit of an appraisal of the individual properties. While it may be to their credit that they overvalued the corporate property in the apportionment, they have not contended, nor has the district court found, that this overvaluation constituted a deliberate settlement between the parties for damages incurred in the defendants' acquisition of the Farquhar property. Despite the undervaluation of their own property relative to the corporation's assets, Serianni and Savin made a handsome profit on the sale. The two directors must hold those profits in trust for the corporation. News-Journal Corporation v. Gore, 147 Fla. 217, 222, 2 So.2d 741, 744 (1941); 3 Fletcher § 861.1 at 233, § 863 at 247. See also Wilkins v. Wilkins, 144 Fla. 590, 591, 198 So. 335, 336 (Fla.1940); Reaves v. Hembree, 330 So.2d 747, 749 (Fla.App.1976).
 
 III
 
 49
 We find that the opportunity to buy Mr. Farquhar's 160 acres constituted a corporate opportunity and that the defendants, Serianni and Savin, breached their fiduciary duties to the corporation by preempting that opportunity. We also find that the attempted ratification of the preemption does not preclude Farber from bringing a derivative suit on behalf of the corporation.
 
 
 50
 The corporation is entitled to the profits of the directors' subsequent sale of the 160 acres. We remand the case to the district court to determine the proper amount of damages and the appropriate method for distributing those damages.
 
 
 51
 REVERSED AND REMANDED.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 [1]
 The court treated these findings and conclusions as tentative at the time they were made. Three weeks later it entered an order adopting these oral findings of fact and conclusions of law as final
 
 
 [2]
 The court stated: "The minutes of the meeting do indicate that the stockholders at least indicated a sense of approval to the idea of acquiring abutting land from Mr. Farquhar." Record Excerpts at 65
 
 
 [3]
 The court reiterated this finding several times in its oral statement and its subsequent written opinion. See, e. g. Farber v. Servan Land Company, Inc., 393 F.Supp. 633, 635-36, 638 (S.D.Fla.1974)
 
 
 [4]
 THE COURT: ... This is not the typical situation where corporate officers have acted in some high-handed manner so that it enriched themselves purely at the expense of and the detriment to the corporation. I think it is a salutary principle of real estate investment, especially in connection with a golf course and abutting undeveloped property, that the more real estate you have aggregated, the more attractive the deal is; and if you had a golf course shorn of any undeveloped abutting real property, the value of the golf course might be considerably reduced. So we have a situation here where I think that, in the long haul, the fact that Mr. Serianni and Mr. Savin had the 160 acres and were willing to lump it in with the golf course did benefit the stockholders of Servan Land Company. That does not excuse the fact that they should have permitted the stockholders the right in 1969 to acquire that 160 acres for the corporation
 Record Excerpts at 74.
 THE COURT: ... There has not been compliance with that high standard by Mr. Serianni and Mr. Savin in 1969... We then come to a matter, since there was not, what damages are involved, and the appraiser will be necessary to determine that; and there may not be any damages. I would not at all be surprised that if the result of the appraiser shows that taking the two packages together that the golf course wasn't worth the $5 million dollars out of the total price... If that is the situation, the chips fall in that fashion.
 MR. ANDERSON: Yes, sir. That is fine. That is Count II. It seems to me we have the Count I contention that these fiduciaries profited by acquiring the 160 acres, and they did it when they had the obligation to make this to the corporation.
 Now there is no evidence as to whether or not the corporation would have accepted it or not. That burden is on them, and it is a heavy burden. And they profited to the extent of 2 million 3 hundred thousand dollars or 2 million 4 hundred thousand dollars.
 If this 160 acre acquisition was valuable to the corporation then they should have let the corporation have it. If there is a value to that 160 acres in March of 1969, then the corporation should have that 160 acres. It is not the subsequent development that changes anything. In any event in Count I we are contending that we are entitled to the entire profit. In Count II the wrong alleged
 THE COURT: I understand your contention.
 MR. ANDERSON: Here is a case, as an example, Irving Trust vs. Deutsch
 THE COURT: I quite appreciate what you are saying, and let me see if I do understand your contention.
 You are contending under Count I, since I have found that they failed to measure up to the standards required of corporate officers and corporate trustees in 1969 by acquiring the property in their individual names, that therefore all of the profit obtained by Mr. Serianni and Mr. Savin should inure to the benefit of the corporation.
 MR. ANDERSON: Yes, sir.
 THE COURT: And the Court finds as to that proposition that it would be very tempting to rule in your favor on that basis, if nothing more than to remove the temptation from other corporate officers to so dabble in matters where they have a conflict of interest, and I would be so inclined, if it were not for the fact that I think this holding of the 160 acres by Mr. Serianni and Mr. Savin was such a benefit to the corporation. And although there is no evidence one way or the other on the matter, the Court is convinced that Mr. Serianni and Mr. Savin expected to sell the 160 acres in conjunction with sale of the golf course.
 Id. at 76-78.
 THE COURT: Obviously counsel disagrees with my interpretation that a wrong was committed in not measuring up to the standards, but he is not entitled to relief as he contends under Count I.
 Id. at 80.
 
 
 [5]
 This was because "the 160 acres in question were available to aggregate the acreage and assets (of the corporation) so that the entire package was considerably more attractive to purchasers." Id. at 636
 
 
 [6]
 " 'Whether in any case an officer of a corporation is in duty bound to purchase property for the corporation, or to refrain from purchasing property for himself, depends upon whether the corporation has an interest, actual or in expectancy, in the property, or whether the purchase of the property by the officer or director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created.' " 3 Fletcher, § 861.1 at 234
 
 
 [7]
 There was insufficient evidence on which to base a finding that the corporation was financially unable to buy the land. Further, the district court acknowledged that such a finding would not be dispositive of the case. Farber, 393 F.Supp. at 638
 The court's finding that the corporation was often run contrary to sound business practices, see id. at 635-36, does not change the conclusion that a corporate opportunity existed as a matter of law.
 
 
 [8]
 Further, it is inappropriate, under the circumstances, to attempt to second-guess the reaction of the stockholders, had Serianni and Savin presented their proposal to purchase the land before the sale was completed
 
 
 [9]
 See Fulton v. Clewiston, Ltd., 100 Fla. 257, 129 So. 773 (1930) (Florida Supreme Court refuses to find ratification of a fraudulent act, but fails to state whether such ratification is possible under other circumstances)
 
 
 [10]
 It should be noted that it was also to Serianni and Savin's benefit to sell the properties jointly, since the joint sale increased their profits, as well as the corporation's