**R.W. STEVENS, By and For the Benefit of PARK VIEW CORPORATION, an Alaska corporation, Appellant,**

**v.**

**F.M. RICHARDSON, Rose–Marie Richardson, Hector Guzman, and Providence Guzman, Appellees.**

No. S–1860.

Supreme Court of Alaska.

May 6, 1988.

Hugh G. Wade, Wade & DeYoung, Anchorage, for appellant.

Lewis F. Gordon and A. William Saupe, Baily & Mason, Anchorage, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

OPINION

MOORE, Justice.

A dissenting shareholder in a closely-held corporation brought this derivative suit to set aside a real estate commission the corporation paid to an officer-director-shareholder. The superior court granted summary judgment, holding that the commission was reasonable and fair to the corporation and therefore was not improper. We affirm the summary judgment on the alternative ground that the shareholders ratified the payment of the commission.

I.

In 1963, two married couples, Robert and Elizabeth Stevens and Morgan and Rose-Marie Richardson, incorporated the Park View Corporation for purposes of real estate investment in Alaska. Soon after incorporating, they sold stock to a third couple, Hector and Providence Guzman. Each of the six spouses individually owned one-sixth of the Park View stock.[1]

During the next seventeen years, the corporation acquired a number of rental properties in Anchorage, including a 15-unit apartment house and two houses converted to commercial uses, all located on contiguous lots on West 9th Avenue, and two duplexes on West 14th Avenue.

Although the corporation invested exclusively in Anchorage property, only the Richardsons lived in Anchorage. The Guzmans lived in Arizona and the Stevenses in Seattle. All of the property management duties fell upon the Richardsons, primarily upon Rose-Marie. The Richardsons dealt with tenants, collected and deposited rents, paid the bills, kept the corporate books and records, and attended to a broad range of maintenance tasks such as cleaning and painting apartments, landscaping, and arranging for major repairs. As compensation, the corporation provided them with an apartment and half of their telephone, utility, and car expenses.

---

1. In 1968, the directors amended the bylaws to provide that, although each spouse owned his or her stock individually, each couple would vote both spouses' stock as a block. However, the shareholders did not always follow this rule.

For example, at a special shareholders' meeting held on April 28, 1981, Elizabeth Stevens voted her stock individually while Robert Stevens abstained.

During the spring of 1980, the Richardsons became interested in liquidating the corporation. They apparently believed that liquidation would be advantageous for tax reasons and were growing tired of the burden of property management. In addition, their relationship with Robert Stevens had deteriorated.

On January 10, 1981, the Richardsons sent the Guzmans and Stevenses notice of a special meeting of shareholders to take place via telephone conference call at a specified time on January 21. The notice indicated that the purpose of the meeting was to act on a proposal for corporate liquidation and to consider a request by the Richardsons that their compensation for management be increased to include a cash stipend of $500 per month.

When the Stevenses did not answer their telephone on January 21, despite having received the notice, the Richardsons and Guzmans conducted the meeting without them. The Richardsons and Guzmans voted unanimously to liquidate the corporation as soon as possible, and to that end, to sell all of the corporation's real estate. They agreed upon an asking price of $1,100,000 for the 9th Avenue properties and $125,000 for each of the 14th Avenue duplexes. They voted unanimously to increase the Richardsons' management compensation by $500 per month, and informally agreed that Rose–Marie Richardson, a licensed real estate salesperson, should be compensated at the "going rate" for her efforts in connection with marketing and selling the 9th Avenue apartments. They did not adopt a formal resolution regarding a real estate commission, apparently because they did not want Robert Stevens to accuse them of acting behind his back.

Following the meeting, Rose–Marie undertook to sell the real estate. She drafted a prospectus, ran ads, posted signs, and showed the 9th Avenue apartments to at least twenty people and the 14th Avenue duplexes to approximately a hundred people. When the eventual buyers of the 9th Avenue properties made an offer in April 1981, Rose–Marie negotiated with them to arrive at the sales price of $1,050,000. The buyers, both real estate brokers with considerable experience in marketing downtown Anchorage properties, testified that they believed this price was above fair market value, and that they had been willing to pay it only because they had a specific development project in mind.

On April 28, 1981, after notice, the corporation held a combined special meeting of directors and shareholders. All of the shareholders participated, either in person or by proxy. By a two-thirds vote, the shareholders elected Mr. and Mrs. Richardson and Mr. and Mrs. Guzman directors, and named Morgan Richardson president, Hector Guzman vice-president, and Rose–Marie Richardson secretary and treasurer. All of the new directors and five of the six shareholders (including Elizabeth Stevens but not her husband) then approved a proposed liquidation plan.

On May 18, 1981, at another combined special meeting, all of the directors and two-thirds of the shareholders voted both to accept the offer Rose–Marie had obtained on the 9th Avenue properties and to award Rose–Marie a commission of $37,000, or 3.5% of the sales price. The Stevenses dissented.

Rose–Marie had previously sold property for the corporation, but this was the first and only time the corporation paid her a commission. However, the corporation had paid commissions to other real estate agencies. Three Anchorage real estate agencies advised Rose–Marie that they would have required a commission of six to ten percent to sell the 9th Avenue properties. Rose–Marie decided to sell the properties herself to save the corporation money. She requested a 3.5% commission after the Guzmans and two attorneys advised her it was fair. Rose–Marie obtained her real estate license in 1973, for personal reasons and not at the request of the corporation.

On January 18, 1982, the corporation's last special meeting, the shareholders voted to dissolve the corporation, with Robert Stevens abstaining. Upon dissolution, each shareholder received a net distribution of approximately $253,000.

In August, 1982, Robert Stevens brought a derivative suit on behalf of the shareholders of the now-dissolved corporation against the Richardsons and the Guzmans. The complaint alleged ten counts of wrongdoing and included numerous claims for relief, including a claim for recovery of Rose–Marie's $37,000 commission.

Each party moved for summary judgment and each opposed the other's motion. The superior court entered summary judgment in favor of the Richardsons and Guzmans on every issue except a claim for recovery of $329.96 paid to Providence Guzman for travel expenses. Subsequently, the court awarded costs and attorneys' fees to the Richardsons and Guzmans. The attorneys' fees award was $14,000, approximately 60% of their actual attorneys' fees.

Stevens appeals, challenging the court's ruling regarding the $37,000 commission and the award of attorneys' fees. Stevens argues that the payment of the commission to Rose–Marie is invalid per se, unless required by an enforceable contract or ratified by the shareholders. Furthermore, he argues that the purported shareholder ratification was invalid because interested shareholders were permitted to participate.

## II.

■ At common law, directors are not entitled to retroactively compensate themselves for services already rendered. "It is a well-recognized rule that directors or managing officers of a corporation cannot legally vote to themselves or other officers compensation for past services, where there is no agreement that such officers should be paid." 5A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 2140, at 112 (perm. ed. 1987).

This rule seeks to avert two dangers. First, permitting directors and officers to compensate themselves retroactively invites improper self-dealing. Comment, *Retroactive Compensation for Director-Officers*, 25 Ind.L.J. 212, 215 (1950). Second, a corporation's promise to pay for past services is likely to lack consideration. Not only are gratuitous payments unenforceable as a matter of contract law, but they do not benefit the corporation and thus are ultra vires as a waste of corporate assets. 5A W. Fletcher, *supra* p. 7, § 2140, at 112–113. In short, most payments for past services are unreasonable.

■ We now adopt the common law rule with regard to directors' compensation for past services. Specifically, in the absence of an express or implied agreement authorizing the compensation, directors cannot vote to compensate themselves for past services.[2]

■ When a board improperly awards retroactive shareholder compensation, ratification will validate the action. Many courts have held that only unanimous ratification can cure the defect and bar subsequent suit.[3] Other courts have held that a

**2.** Alaska, like most states, has a statute that permits directors to fix their own compensation. *See* AS 10.05.174; O'Neal, *Close Corporations* § 8.10, at 84 (3d ed. 1986). AS 10.05.174 provides that "[t]he board of directors may fix the compensation of directors unless otherwise provided in the articles of incorporation." This statute does not alter directors' basic fiduciary duty to be reasonable and fair to the corporation. Nor does it appear to abrogate common law restraints on compensating past services or wasting corporate assets, or restrictions on voting of self-interested directors in conflict-of-interest transactions. Instead, the statute merely reverses the common law notion that directors were not entitled to compensation at all. *See, e.g.,* H. Henn & J. Alexander, *Laws of Corporations* § 244, at 665 (1983) ("[t]he traditional view was that the director was, in theory, a representative shareholder whose shareholdings and dividends therefrom justified special attention to corporate affairs without further reward[;] ... directors were without inherent authority to fix their own compensation").

**3.** *See* 3 W. Fletcher, *supra* p. 7, § 982, at 659 ("[u]nanimous stockholder ratification must be obtained where it is alleged that there has been a waste or gift of corporate assets"); 2 W. Fletcher, *supra,* § 429, at 285 ("if the stock option plan results in a gift of corporate assets to the executives, then its defects will not be cured by stockholders' ratification unless such ratification is unanimous"); 5A W. Fletcher, *supra,* § 2139, at 107; 12B W. Fletcher, *supra,* § 5849, at 264; N. Lattin, *The Law of Corporations* 266–67 (2d ed. 1971) ("[g]ifts which are labeled salaries, bonuses, retirement annuities or pensions, or options to purchase stock, are gifts nevertheless and directors have no authority to make them without the unanimous consent of the shareholders"); and cases cited therein.

ratification by a majority of the shareholders will suffice.[4]

■ The plaintiffs in this case do not argue that unanimous ratification should be required in Alaska. Instead, they propose a rule allowing ratification by a majority. In light of the plaintiffs' posture and the lack of argument on this issue, we are loath to adopt a stricter rule in this case.

The question remains whether the votes of interested shareholders can be counted to make up the majority in a shareholder ratification of retroactive compensation. There is no unanimity on this question among other courts or in treatises.

Numerous authorities state that interested shareholders should not be entitled to vote. For example, 12B W. Fletcher, *supra* p. 7, § 5882, at 328 (footnote omitted), states:

> [W]hen ratification is possible and the proceedings are proper, stockholders may sanction the act of a corporate officer or director and thus abolish any cause of action that the corporation might have against that individual, provided, of course, that the vote was limited to disinterested stockholders.

Similarly, in *Farber v. Servan Land Co.*, 662 F.2d 371, 380 (5th Cir.1981) (citations omitted; footnote added), the court stated:

> While it is true that directors ordinarily may vote their stock on measures in which they have a personal interest, most authorities agree that " '[t]he violation of their duty by corporate directors cannot be ratified by the action of those who were guilty of participation in the wrongful acts, even though they constitute a majority of the directors or of the stockholders.' " [5]

Authorities stating the opposite view include 1 W. Sardell, *Encyclopedia of Corpo-*

*rate Meetings, Minutes, and Resolutions, Revised* 357 (rev. ed. 1978) (footnotes omitted):

> It has been held that, in the absence of an established bonus plan, directors must have a formal authorization from the stockholders in order to give bonuses for past services. But the better rule seems to be that stockholders, including interested. director-stockholders, may ratify the act of directors in granting such a bonus if no fraud is involved.

*See also* 12B W. Fletcher, *supra* p. 7, § 5795, at 132–33 (footnotes omitted) ("[t]here is authority that majority stockholders ordinarily cannot ratify their own acts as directors, although a majority stockholder may vote to ratify his own act as director, provided the ratification will not be fraudulent as to minority stockholders, and the ratification of a contract in which a stockholder is interested is valid, even if carried by his vote"); N. Lattin, *supra* note 3, at 265–66 (footnote omitted) ("the shareholders may, however, ratify a voidable contract of this kind and the interested director may vote his shares in aid of ratification," referring to conflict-of-interest transactions involving compensation of directors or officers, but not specifically to payment for past services); O'Neal, *supra* note 2, § 8.10, at 85 (footnote omitted) (not specifically referring to past compensation —"[i]n those jurisdictions in which directors' resolutions fixing their own compensation are merely voidable and not absolutely void, interested directors can vote the shares that they hold to ratify voidable compensation arrangements as long as the arrangements are not fraudulent or oppressively unfair to minority shareholders").

An example of a case supporting this view is *Kirwan v. Parkway Distillery Inc.*, 285 Ky. 605, 148 S.W.2d 720, 723 (1941):

---

4. *See, e.g., Chambers v. Beaver–Advance Corp.*, 392 Pa. 481, 140 A.2d 808, 811 (1958); 12B W. Fletcher, *supra* p. 7, § 5795, at 132 ("[i]t is now generally held that majority stockholders may ratify an ultra vires act, unless the act is not only ultra vires but in addition illegal and void").

5. The court cited *Wolf v. Frank*, 477 F.2d 467, 477 (5th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct.

287, 38 L.Ed.2d 218 (1973); *Chesapeake Constr. Corp. v. Rodman*, 256 Md. 531, 261 A.2d 156, 159 (1970) (quoting 19 C.J.S. *Corporations* § 763(b), at 112); *Claman v. Robertson*, 164 Ohio St. 61, 128 N.E.2d 429 (1955) (ratifying majority must be disinterested); 12B W. Fletcher, *supra* p. 7, § 5882, at 328–29; 19 Am.Jur. *Corporations* § 1248, at 656 (1965); and 19 C.J. S. *Corporations* § 1016, at 493 (1940).

[T]here is a radical difference when a stockholder is voting strictly as a stockholder and when voting as a director. When voting as a stockholder he has the legal right to vote with a view of his own benefits and is representing himself only; but, a director represents all the stockholders in the capacity of trustee for them and cannot use his office as director for his personal benefit at the expense of the stockholders.

There are also law review articles expressing this view. *See* Sneed, *The Stockholder May Vote as He Pleases: Theory and Fact,* 22 U.Pitt.L.Rev. 23, 37–39 (1960); Note and Comment, *Corporations—Ratification by Stockholders Who Control a Majority of the Stock of their Own Voidable Contracts Made as Directors—Rights of the Minority Stockholders,* 28 Mich.L. Rev. 181, 181 (1930) ("[t]he rule is well established that stockholders are not disqualified by their interest from voting to ratify their own voidable contracts made as directors").

In view of this patent split in authority, the only clear conclusion we can draw is that no well-established uniform rule exists among other jurisdictions. One of the few treatises that hits the nail on the head is E. Brodsky & M.P. Adamski, *Law of Corporate Officers and Directors* § 3:06, at 12 (1984), stating that the question "whether approval by shareholders who are interested in the transaction has the same effect as independent shareholder approval" is a "major unresolved question."

Professor Robert Clark, writing generally on the issue of executive compensation, has observed that the legal system has adopted an intermediate position between intrusive review and laissez-faire. R. Clark, *Corporate Law* § 6.1, at 193 (1986). The approach has two aspects: (1) procedural controls, focusing on disclosure and the decision making process; and (2) potential review of fairness, as a sort of relief valve. *Id.* at 193–94. Professor Clark believes that for public corporations, it would be better to focus on the first of these two aspects: "[I]t seems desirable to govern public corporations by a rather categorical, process-oriented rule." *Id.* § 6.3, at 219. However, he believes that process-oriented rules requiring decision makers to be independent are inappropriate for close corporations:

> In many close corporations, ... the investors and the chief employees are the same persons, or their members significantly overlap, and the question of executive compensation is but a part of the larger problem of dividing the fruits of the business among the various participants. Basically this division is accomplished by bargaining among all the participants.

*Id.* at 220–21.

Professor Clark does not offer a solution for the particular question before this court. However, we agree with his general analysis that it is unworkable to require participants in closely-held businesses to disqualify their votes on matters involving self-interest. Decisions made in a small corporation often have a direct and immediate financial impact on many or all of the participants.[6] Yet, it seems to us that that is not a sufficient ground for disqualifying their votes.

The purpose of disqualification is to prevent corporate decisions from being made by those who are unable to take an objective look. This theory has great merit in the context of decision making in large public corporations, where process control can effectively guarantee fairness for a large number of diverse investors. Hired outside directors are thought to be objective when making decisions regarding compensation in public corporations. However, the same cannot be said of typical decision makers in closely-held corporations.

Under a rule requiring disqualification due to interest, many group decisions in closely-held corporations would be made

---

**6.** For example, in 1981, the Park View Corporation was in the process of liquidating its assets and distributing the proceeds. The $37,000 payment to Mrs. Richardson would have a direct, substantial, and immediate financial effect on the amount of proceeds each shareholder would receive. Yet, it would be ludicrous to deny the participants the right to make that decision.

by a tiny minority of the participants, giving them disproportionate veto power for which they neither bargained nor paid. We believe that such a rule, intended to promote fairness in decision making, would instead lead to unfairness. For that reason, we do not adopt it in the context of closely-held corporations.

However, we do not intend to abandon judicial control over procedure while also declining to review substantive fairness. To do so would only invite the mulcting of minority shareholders. Thus, we hold that where a dissenting shareholder claims that a closely-held corporate board has acted outside its authority by awarding retroactive compensation, the act is valid if a *disinterested* majority of the shareholders ratified it. If the votes of *interested* shareholders were necessary to make up the majority, the act is presumptively valid, but the plaintiff can still prevail by proving substantial unfairness.

### III.

In this case, the superior court did not find that an express or implied contract authorized the $37,000 payment to Rose–Marie Richardson. Instead, the court granted summary judgment against the Stevenses on the grounds that the shareholders ratified the act, and the compensation was reasonable. Our review of the undisputed facts convinces us that the superior court was correct.[7]

At the May 18, 1981 combined special meeting of shareholders and directors, all the shareholders voted, either personally or by proxy, on whether to approve Rose–Ma-

rie's commission. The shareholders approved the commission by a 4 to 2 vote, with Robert and Elizabeth Stevens dissenting.[8]

■ However, at least one of the four votes necessary to make up the majority was cast by an interested party—namely, Rose–Marie Richardson. Under these circumstances, while the payment to her is presumptively valid, the superior court properly examined the substance of the transaction, and found it fair. We agree.[9]

Undisputed evidence indicates that it is standard practice in Anchorage for a seller of commercial property to pay the real estate agent who arranges the sale a commission of six to ten percent of the purchase price. Rose–Marie was a licensed real estate salesperson who brought her professional skills to the task of selling the property. She found good buyers and negotiated a good price. The corporation accepted the benefit of her efforts by selling at those terms. If Rose–Marie had not assumed responsibility for selling the property, the corporation would almost certainly have had to employ another agent, since none of the other shareholders was available to assume the responsibility. By selling the property herself for a commission of only 3.5%, Rose–Marie saved the corporation a great deal of money.

No evidence suggests that selling real estate was one of Rose–Marie's usual duties on behalf of the corporation. Stevens himself described Rose–Marie's duties as limited to property management: "deal[ing] with tenants, collect[ing] and de-

---

7. In reviewing the trial court's grant of summary judgment, this court must determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *State v. Jennings,* 555 P.2d 248, 250 (Alaska 1976). Additionally, this court can affirm a judgment of the superior court if any basis for doing so appears from the record. *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.,* 584 P.2d 15, 24–25 (Alaska 1978).

8. Although this was a combined directors and shareholders meeting, this particular vote must have been a shareholders' vote, for Robert and Elizabeth Stevens cast votes and they were

shareholders, not directors. Ordinarily, a shareholder ratification must follow the act intended to be ratified. That is, there should be a vote of the board, followed by a ratification vote by the shareholders. The shareholders themselves have no power to manage the corporation. In this case, there was only a single combined vote of all the participants. However, we are willing to overlook this deviation from normal procedure. It appears that all the participants intended to take corporate action.

9. Under these circumstances, we do not decide whether F.M. Richardson, or any of the other participants, were interested in the decision to pay the $37,000 commission to Rose–Marie.

posit[ing] rents, [paying] the bills, and arrang[ing] for maintenance and repairs." Clearly, the commission was fair and reasonable, and the majority shareholders did not breach their fiduciary duty to the minority shareholders.

During the summary judgment hearing, the court pressed counsel for Stevens to indicate what facts, if any, he expected to develop at trial which were not already in the record. Counsel conceded that additional facts would be "redundant." To the extent that the record shows factual disputes, they are immaterial. For example, the parties dispute how many potential buyers viewed the 9th Avenue properties, and how many weeks Rose–Marie was out of town while the properties were listed for sale.

On the basis of the undisputed facts in the record, the Guzmans and Richardsons were entitled to judgment as a matter of law because the shareholders ratified the fair and reasonable commission.

### IV.

Stevens attacks the attorneys' fees award on the ground that it is "disproportionate" to the amount in controversy.

█ The power to award attorney's fees is within the discretion of the trial court, and this court will not interfere absent a clear abuse of discretion. Alaska R.Civ.P. 82(a); *State v. Fairbanks N. Star Borough School Dist.*, 621 P.2d 1329, 1335 (Alaska 1981). We see no abuse of discretion here. The fact that Judge Cranston awarded the Richardsons and Guzmans more than half of their actual fees does not constitute an abuse of discretion per se. We have affirmed partial fees awards as high as 75% of actual fees. *Brunet v. Dresser Olympic Div. of Dresser Indus.*, 660 P.2d 846, 847–48 (Alaska 1983). *See also Gold Bondholders Protective Council v. Atchison, Topeka and Santa Fe Ry. Co.*, 658 P.2d 776 (Alaska 1983). Nor are we persuaded that the fees which prevailing defendants may recover should be limited as a matter of law by the amount of damages the plaintiff unsuccessfully sought. Even a claim for a small amount of damages may be expensive to defend. As long as defense costs are reasonable, a successful defendant may recover whatever portion the trial court in its sound discretion sees fit to award.

AFFIRMED.