**In re Melvin R. McCOY, Debtor.**

**TROPICAL EXPLORATION CORPORATION, INC.,**
Plaintiff,

v.

**Melvin R. McCOY, Defendant.**

**Bankruptcy No. 89–5024–8P1.**
**Adv. No. 89–639.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Nov. 7, 1990.

Roberta Colton, Tampa, Fla., for plaintiff.

David Steen, Tampa, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS is a Chapter 11 case filed by Melvin R. McCoy (Debtor) and the matter under consideration is a claim of nondischargeability asserted by Tropical Exploration Corporation, Inc. (Tropex), who filed this adversary proceeding. The claim of nondischargeability is set forth in a two-count Complaint. In Count I, it is claimed by Tropex that the debt allegedly owed by the Debtor to Tropex should be declared to be nondischargeable based on § 523(a)(4) of the Bankruptcy Code, and because the Debtor committed defalcation while acting in a fiduciary capacity. The claim set forth in Count II alleges in the alternative that the Defendant embezzled corporate funds and, therefore, the Debtor is liable for a debt claimed to be owed to Tropex, which debt also should be declared to be nondischargeable by virtue of § 523(a)(4) of the Bankruptcy Code. The amount of indebtedness claimed to be a debt owed to by Tropex is in the amount of $95,000.00.

The facts relevant to the resolution of the issues raised by the Complaint filed by Tropex as established at the final evidentiary hearing are as follows:

Prior to the time relevant, the Debtor was employed as a geologist in the Kingdom of Saudi Arabia where he met Ahmad Gama (Gama), a Saudi businessman. Gama expressed an interest in investing in the United States, in all types of oil and gas explorations which claimed to have been a specialty of the Debtor. As a result of the discussions, Gama agreed to invest in a corporation to be formed by the Debtor which in turn was to invest in oil and gas leases owned by Sovereign Oil, a corporation controlled by the Debtor and oil and gas leases owned individually by the Debtor. On October 13, 1983, the Debtor transmitted to Gama the Articles of Incorporation for this newly formed corporation under the name of Tropical Exploration Corporation (Tropex). (Plaintiff's Exh. No. 1). According to the Articles of Incorpo-

ration, the total authorized capital stock of this newly formed corporation was 10,000 shares of par value of $1.00, and named the initial Board of Directors as Almad M.H. Gama [sic], indicating his address to be Sarasota, Florida; Ellen M. Gama (Gama's wife), with the same address; and Nora A. Gama (Gama's daughter), with the same address. It is without dispute that neither Gama nor any members of the family ever resided in Sarasota, Florida, which was the residence of the Debtor. At the original organizational meeting, Gama was appointed as president, the Debtor as vice-president and secretary of Tropex. It is without dispute that the sole stockholders of Tropex were members of the Gama family, all of whom resided in Saudi Arabia.

It is without dispute that at the time relevant Sovereign owned some interest in several oil and gas wells, including the wells known as the Navajo Lake Well, (the Navajo Well); the Kirby Well (Kirby); the Blehm Well (Blehm); and the Brekke Well (Brekke). There is no question that neither Tropex nor any member of the Gama family had any involvement at any time with Sovereign as such or with any other enterprises in which the Debtor was involved.

Shortly after the incorporation of Tropex, the Debtor established a checking account for Tropex in the First Florida Bank in Sarasota. Although Gama was designated as a signatory on the account, it is without dispute that all checks on this account were made by the Debtor. It is without dispute that all bank statements were sent to the Debtor to his office in Sarasota. No bank statements were ever sent to Saudi Arabia for Gama's review. Although Gama did visit Sarasota, he did not request from the bank any statements or any information concerning the status of the account.

It is without dispute that on October 26, 1983, Gama wired $45,000.00 to Florida which was deposited by the Debtor in a bank account of Tropex in Sarasota. It is equally clear that over the course of the next five months, all funds were deposited and withdrawn by the Debtor. In addition, Gama also transferred the sum of $50,-

000.00 by wire transfer to Sarasota and deposited in the bank account of Tropex on March 8, 1984. These funds were also withdrawn by the Debtor between March 2 and April 11, 1984. It was clearly understood by the Debtor and Gama that the funds of Tropex would be used only to purchase interests in gas and oil wells in the name of Tropex and not to be invested in any speculative leases referred to as "wildcat plays" promoted by others.

It is clear that the Debtor and Gama discussed investments in several wells, specifically in Kirby, Blehm and Brekke, in each of which Sovereign or the Debtor owned an interest. There was no specific discussion to invest any funds in any other wells. While the evidence is somewhat unclear, this Court is satisfied there was no agreement between Gama and the Debtor that any of the funds of Tropex would be used to acquire any interest in the Navajo Well.

The check stubs of the checks drawn on the Tropex account by the Debtor and the income tax returns filed by the Debtor for 1984 and 1985 of Tropex indicate that $42,750.00 of the funds of Tropex obtained from Gama were invested in the Kirby well. Notwithstanding, when the interest in the Kirby well was sold, the Debtor and others recovered their investment, except Tropex, who received nothing from the sale or assignment of the leases relating to the Kirby well.

Contrary to documentary evidence, the Debtor claims that all Tropex funds were used for the exploration of the Navajo Well, and Sovereign always recognized that Tropex owned 25% in the Navajo Well. However, it is clear when Sovereign sold its interest in the Navajo well, Tropex again received nothing for its so-called interest. The fact of the matter is there were never any documents evidencing ever that Tropex acquired interests in any of these wells, Navajo, Kirby or the others, and when the interest of Sovereign and the Debtor's interest in these wells were sold, i.e., in Navajo, Kirby, Blehm, and Brekke, the claimed interest of Tropex was completely ignored and no longer existed.

In sum, it is clear that none of the funds of Tropex were ever used by the Debtor acting as the officer in charge of the affairs of Tropex to acquire any interest in any oil and gas wells. There is evidence in this record to show that some of the funds were used by the Debtor to loan funds to Sovereign, a corporation controlled by the Debtor. He concedes, as he must, that he did "loan" funds to Tropex, but claims that he had the right to use all Tropex funds as it pleased for any purpose he decided to have been proper. It is without dispute that Gama did not exercise even a minimal control over the affairs of Tropex or over the conduct of the Debtor. The fact remains that the Debtor used at least some of the funds invested by Gama in Tropex not for the acquisition of any interest in any other undertaking except ventures in the oil and gas explorations by Sovereign. There is no believable evidence in this record to find and accept the contention of the Debtor that Tropex was supposed to have a 25% interest in some other unspecified ventures in the future, and the Debtor still believes that he could make money in some new projects such as acquisition of oil contracts on the spot market.

After the commencement of the Chapter 11 case, the Debtor changed his tune and turned around and now claims that he cancelled the interest of Tropex in the Navajo well and unilaterally granted a replacement interest to Tropex, in the Blehm and Brekke wells. However, later on the Debtor denied that Tropex ever had any interest even in these two wells. It is not hard to infer from the foregoing that the activity of the Debtor was not to far removed from the activity of a carni who is running a shell game—now you see, now you don't—at state fairs. The bottom line is that Tropex no longer has any funds and Tropex never had and does not have any recognized interest now in any of the wells controlled by, Navajo, Kirby, Blehm or Brekke.

It is without serious doubt that most, if not all, the checks drawn on Tropex account by the Debtor (Plaintiff's Exh. No. 28) were made payable to Sovereign or to

Moffit Ellis Engineering Services, an entity which appears to be a department of Sovereign. It is unclear from this record what was the purpose of these checks except the statement of the Debtor that the funds were used to guarantee the expenses connected with drilling the Navajo Well.

These are basically the operative facts as appear from the record on which the claim of nondischargeability of Tropex is based.

The claims in both Count I and Count II of nondischargeability are based on § 523(a)(4). This Section provides, inter alia, that a liability of a debtor does not discharge an individual from any debt based on fraud or defalcation while acting in a fiduciary capacity, or embezzlement or larceny.

■ Under this Section, the burden is on the Plaintiff to establish that the Debtor was acting in a fiduciary capacity; that while acting in such capacity committed either fraud or defalcation or was guilty of embezzlement. There is no question that the burden of proof is clearly on the party who asserts that a specific obligation of the Debtor is nondischargeable. While it is true that there is no general agreement among bankruptcy courts whether the quantum of proof required to sustain this burden of proof is clearly convincing or merely a preponderance of the evidence, and this question is currently pending before the Supreme Court in the case of *In re Garner*, 881 F.2d 579 (8th Cir.1989), *cert. granted*, —— U.S. ——, 110 S.Ct. 1945, 109 L.Ed.2d 308 (1990). This Court is satisfied that a standard of proof involving an exception to discharge which involves a moral turpitude should be clear and convincing evidence rather than mere preponderance, which was decided by the Supreme Court to the contrary. *In re Danns*, 558 F.2d 114 (2d Cir.1977).

Of course, the initial inquiry must be addressed to the question of whether or not the Debtor acted as a fiduciary in connection with the transactions involved here. It is a generally accepted proposition that the definition of the term "fiduciary" as used in § 523(a)(4) is determined with reference to federal law. *In the Matter of Angelle*,

610 F.2d 1335, 1341 (5th Cir.1980). Under this approach, in order to warrant the finding of a fiduciary relationship, there must be a technical trust in existence ab initio. As stated in *Angelle*, the relationship must exist ex contractu and not ex maleficio, that is, not as the result of the wrongdoing, but created by contract. This conclusion should not be interpreted, however, to mean that in considering this question the bankruptcy court is limited in its consideration of federal case law and should ignore applicable local law. *In re Crosswhite*, 91 B.R. 156 (M.D.Fla.1988). It cannot be gainsaid that either under both Florida and federal law, a corporate officer owes a fiduciary duty to the corporation and is bound to act with fidelity and with the utmost good faith. *Farber v. Servan Land Co.*, 662 F.2d 371, 377 (5th Cir.1981), *citing Flight Equipment and Engineering Corp. v. Shelton*, 103 So.2d 615, 626 (Fla.1958); *Everdell v. Preston*, 717 F.Supp. 1498, 1501 (M.D.Fla.1989).

■ Based on the foregoing, there is hardly any doubt that the Debtor, who was, and apparently still is, an officer of Tropex, owed to Tropex the duty to deal fairly with the affairs of Tropex, and in the best interest of Tropex even though the relation between him and the corporation was not created by a technical or express trust. *In re Cramer*, 93 B.R. 764, 768 (Bankr.M.D.Fla.1988). This conclusion leads to the ultimate question of whether or not the liability, if it exists, is the result of his defalcation while acting in a fiduciary capacity, vis-a-vis Tropex, by expending the funds of Tropex either for purposes which were not authorized by Gama or for his own benefit directly or indirectly. The difficulty in this case stems from the fact that the term, "defalcation", has not been interpreted by courts uniformly. There is substantial authority to the effect that defalcation might be nothing more than the slightest misunderstanding which need not be intentional, and negligence or ignorance by itself may be tantamount to defalcation. *Crosswhite, supra. Morales v. Codias*, 78 B.R. 344, 346 (Bankr.S.D.Fla.1987). In the case of *In re Johnson*, 691 F.2d 249, 257

(6th Cir.1982), the court held that "the objective fact that monies paid into the building contract fund were used for purposes other than to pay laborers, subcontractors, or materialmen first is sufficient to constitute defalcation." The broadest possible definition was stated by the Court in the case of *In re Waters*, 20 B.R. 277, 280 (Bkrtcy.W.D.Tex.1982), where the court found that the simple failure to account for funds will render a debt nondischargeable. The same result was reached in the case of *In re Cowley*, 35 B.R. 526 (Bkrtcy.D.Kan. 1983) where the court stated that defalcation "is the slightest misconduct, and it may not involve misconduct at all." Be that as it may, there is no question that the term "defalcation" has a much farther reach and broader than the term "embezzlement" or "larceny". *In re Kelley*, 84 B.R. 225, 230 (Bankr.M.D.Fla.1988). In the case of *In re Kern*, 98 B.R. 321 (Bankr.S.D. Ohio 1989), the court held that the innocent and negligent conduct of a fiduciary to account for funds constituted defalcation and in turn rendered the liability nondischargeable under § 523(a)(4). Be that as it may, there is hardly any question that the failure to account for funds entrusted to one would suffice to establish defalcation. *Crosswhite, supra.*

In the present instance, it appears that the funds invested by Gama in Tropex were to be used solely for the acquisition of oil and gas leases in wells owned by, or at least in part controlled by Sovereign. The funds of Tropex were used without doubt to develop the Navajo well owned by Sovereign, the corporation controlled by the Debtor. However, it is clear that at no time did the Debtor undertake the steps necessary to assure that Tropex did acquire any interest in the Navajo Well and that its interest was recognized and protected rather than completely ignored, which in fact occurred in this case.

Based on the foregoing, it appears that as far as it could be determined from this record that while the funds of Tropex were used by the Debtor in connection with the development of the Navajo Well, and some of it was invested in the Kirby well, Tropex again received nothing in return for these so-called investments in any of the wells maintained earlier. There is nothing in this record to substantiate the proposition urged by the Debtor that his conduct is excusable because Gama gave him absolute carte blanche authority to use the funds to be invested by Tropex as he saw fit and had no duty to invest the funds in any particular well, i.e., the Navajo Well. There is hardly any doubt that the conduct of the Debtor clearly fell far short of the standard of care imposed on the corporate officers dealing with corporate funds. The fact that other officers or stockholders of the corporation, in this instance, Gama or his family, did not pay any attention to the Debtor's handling of the affairs of Tropex is of no consequence and certainly would not furnish any excuse for the end result produced by the conduct of the Debtor. This being the case, this Court is satisfied that the claim set forth in Count I based on the claim of defalcation by a fiduciary has been established by Tropex with the requisite degree of proof and, therefore, the liability of the Debtor to Tropex shall be declared to be within the exceptive provision of § 523(a)(4).

This leaves for consideration the claims set forth in Count II based on embezzlement. Embezzlement has been defined as a fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. *Crosswhite, supra. In re Beran*, 79 B.R. 493 (Bankr.N.D.Fla.1987). Of course, embezzlement is an independent ground under this subclause for excepting the debt from the general protective provision of the discharge and does not require a showing of a fiduciary relationship. However, applying the quantum of proof which in this Court's view is a clear and convincing evidence, this Court is satisfied that the proof presented in support of this claim is far short of the clear and convincing standard and therefore it cannot be sustained.

A separate Final Judgment will be entered in accordance with the foregoing.